IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Cause No. 3:15-CV-00463-JD-CAN |
| CONCORD COMMUNITY SCHOOLS, | ) ) ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION**

Thomas E. Wheeler, II, #13800-49
Anthony W. Overholt, #16481-49
FROST BROWN TODD LLC
201 North Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
twheeler@fbtlaw.com

## TABLE OF CONTENTS

**Page**

I.      Issue Statement. ................................................................................................ 1

II.     Facts. ................................................................................................................. 2

    A.    The Plaintiffs, the FFRF and the Does. ................................................ 2

    B.    The Defendant, Concord Community Schools. ..................................... 3

    C.    The Concord Performing Arts Department. .......................................... 4

    D.    The Christmas Spectacular. .................................................................. 5

    E.    Design of the Christmas Spectacular. .................................................. 6

    F.    The 2015 Christmas Spectacular Program. ......................................... 8

III.    Discussion. ...................................................................................................... 10

    A.    Preliminary Jurisdictional Issue based on Ripeness. ........................... 10

    B.    Preliminary Injunction Standard. ........................................................ 12

    C.    "Likelihood he will succeed on the merits." ....................................... 13

         1.   Selection of the appropriate framework to analyze the Establishment Clause claim and the applicability of the so-called "coercion test." ...................................... 13

         2.   Application of the modified *Lemon* test, "endorsement" of religion........................ 17

             i.    The "Purpose Prong" of the Lemon Test. .......................................... 18

             ii.   The "Primary Effect Prong" of the Lemon Test – Living Nativity. ................... 22

             iii.  The "Primary Effect Prong" of the Lemon Test – Religious Songs. .................. 25

         2.   Irreparable Harm. ......................................................................................... 27

         3.   Balance of Harms. ........................................................................................ 29

    C.    Judgment on the merits. ...................................................................... 29

IV.    Conclusion. ..................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**Cases**

*Agostini v. Felton*, 521 U.S. 203 (1997) ..................................................................... 18

*Am. Civil Liberties Union of New Jersey ex rel. Lander v. Schundler*, 168 F.3d 92 (3rd Cir. 1999) ................................................................................................................. 23, 24

*Am. Humanist Ass'n v. S. Carolina Dep't of Educ.*, 2015 WL 1268036 (D.S.C. 2015) .............. 16

*Am. Jewish Cong. v. City of Chicago*, 827 F.2d 120 (7th Cir. 1987) (Easterbrook, J., dissenting) ............................................................................................................... 29

*Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542 (10th Cir. 1997) ............................. 18, 26

*Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010) ..................................................................... 10, 12

*Books v. City of Elkhart, Indiana*, 235 F.3d 292 (7th Cir. 2000) ............................................... 17, 23

*Books v. Elkhart County, Indiana*, 401 F.3d 857 (7th Cir. 2005) ........................................ 2, 17, 27

*Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373 (9th Cir. 1994) ................................ 21

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) ..................................... 24

*Clever v. Cherry Hill Township Bd. of Educ.*, 838 F.Supp. 929 (D.N.J. 1993) ........................... 19

*County of Allegheny v. ACLU,* 492 U.S. 573 (1989) ....................................................... 20, 24, 25

*Curley v. Arpaio*, 2010 WL 27923 (D.Ariz. 2010) ................................................................. 26

*Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840 (7th Cir. 2012) ...................... 13, 14, 15, 16

*Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494 (5th Cir. 2007*)*............................................ 28

*Doe v. Wilson Cnty. Sch. Sys.*, 564 F. Supp. 2d 766 (M.D.Tenn. 2008).................................. 20, 21

*Doe. v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402 (5th Cir. 1995) ........................................... 26

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ......................................................................... 18, 22

*Elewski v. City of Syracuse*, 123 F.3d 51 (2nd Cir. 1997) ........................................................... 24

*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) .......................................................... 12, 27

*Figueroa v. Precision Surgical, Inc.*, 423 Fed.Appx. 205 (3rd Cir. 2011) ................................... 27

*Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680 (7th Cir. 1994) ................................ 22

*Florey v. Sioux Falls Sch. Dist.,* 619 F.2d 1311 (8th Cir.), *cert. denied*, 449 U.S. 987 (1980)................................................................................................................................ 19, 26

*Freedom From Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1 (1st Cir. 2010) ...................... 2

*Freedom from Religion Found., Inc. v. New Kensington-Arnold Sch. Dist.*, 919 F. Supp. 2d 648 (W.D.Pa. 2013) ......................................................................................................... 14

*Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803 (7th Cir. 2011) ...................... 2, 28

*Incredible Technologies v. Virtual Technologies*, 400 F.3d 1007 (7th Cir. 2005) ........................ 13

*Judge v. Quinn*, 612 F.3d 537 (7th Cir. 2010) ...................................................................... 27, 29

*Lee v. Weisman*, 505 U.S. 577 (1992)................................................................................. 15

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ...................................................................... 14, 22

*Lynch v. Donnelly*, 465 U.S. 668 (1984)......................................................................... 17, 20

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)......................................................................... 12

*McCreary Cnty., Ky. V. Am. Civil Liberties Union of Ky.,* 545 U.S. 844 (2005) ........................ 23

*Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007 (9th Cir. 2010)........................................ 21

*R.J.J. v. Shineman,* 658 S.W.2d 910 (Mo.Ct.App. 1983) ..................................................... 19, 27

*Rogers v. Hellenbrand*, 118 F. App'x 80 (7th Cir. 2004) ............................................................. 2, 18

*Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 788 F.3d 580 (6th Cir. 2015)........................... 9, 14

*Spacco v. Bridgewater School Dept.*, 722 F.Supp. 834 (D.Mass. 1989) ...................................... 24

*Staley v. Harris Cnty., Tex.*, 485 F.3d 305 (5th Cir. 2007) ...................................................... 10, 11

*Stratechuk v. Bd. of Educ., S. Orange-Maplewood Sch. Dist.*, 587 F.3d 597 (3rd Cir. 2009)....... 27

*Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, -- U.S. --, 132 S. Ct. 12 (2011) ..................... 14

*Weinbaum v. City of Las Cruces, N.M.*, 541 F.3d 1017 (10th Cir. 2008)................................. 23, 30

*Wheeler v. Barrera*, 417 U.S. 402 (1974)................................................................................. 11

**Constitutional Provisions**

U.S. Const. amend. I, cl. 1 ..................................................................................................... 13

# I.      Issue Statement.

On October 7, 2015, a "Complaint for Declaratory and Injunctive Relief" was filed by the Freedom From Religion Foundation and two "Doe" Plaintiffs (collectively "FFRF") against the Concord Community Schools ("Concord" or "School") challenging the School's 2015 Christmas Spectacular as violating the First Amendment's Establishment Clause despite the fact that the 2015 program had not yet been set.  As a consequence the FFRF has asked this Court to enjoin something that does not exist; and, is effectively asking the court to micromanage the development of the 2015 program.  The FFRF's Complaint also ignores the fact that the challenged portions of the program based on their own Complaint make up only twenty (20) minutes of the ninety (90) minute performance, and a microscopic percentage of all of the music performances held during the school year.  Because of the manner in which it was filed, the preliminary injunction request also ignores the inclusion in the 2015 program of music from all three major holidays celebrated in December, Chanukah, Kwanza, and Christmas.  Finally, the FFRF also ignores the fact that under School Board Policy 2240 Jack Doe may opt out of any portion of the performance that he feels "conflict[s] with his/her religious beliefs or value system" thus eliminating any coercive effect.

As a consequence, there are two fundamental flaws with the FFRF's Complaint.  First, the claim as originally filed was not "ripe" in that on October 7, 2015 the 2015 Christmas Spectacular's program had not been established, and indeed the program is not generally set until after the conclusion of the marching band season, which for Concord will not be until after the State Finals on November 7, 2015.  Second, because the Complaint as filed did not involve a "ripe" set of facts, the Establishment Clause concerns raised in the Complaint do not readily apply to the 2015 Christmas Spectacular.  The 2015 Christmas Spectacular contains no Bible readings, and only a short historical narrative and musical performance for each of the three

1

major holidays celebrated in December, Chanukah, Kwanza, and Christmas. Moreover, the vast majority of the program contains secular songs and performances. To the extent that some songs and performances touch on religious themes, the primary purpose is not to endorse any religion, nor do the songs and performances have the effect of endorsing religion[1] under the modified *Lemon* test because "an objective, reasonable observer, 'aware of the history and context of the community and forum in which the religious display appears,' would [not] fairly understand the [2015 Christmas Spectacular] to be a government endorsement of religion." *Books v. Elkhart County, Indiana*, 401 F.3d 857, 867 (7th Cir. 2005) (parenthetical supplied).

As a consequence the FFRF's request for declaratory and injunctive relief seeking to enjoin the School from performing the 2015 Christmas Spectacular as it is currently formulated is not well taken.

## II.     Facts.

### A.     The Plaintiffs, the FFRF and the Does.

According to the Complaint, the FFRF is an association "devoted to … separation of church and state." (D. # 1; Complaint, ¶ 6). This FFRF devotion includes challenging all aspects of what it believes are excessive government entanglements with religion. The scope of these challenges and the arguments made therein indicate that the FFRF sees no room for religion of any kind in government or public schools. *See e.g. Freedom From Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1 (1st Cir. 2010) (unsuccessful Establishment Clause challenge to the recitation of the Pledge of Allegiance based on the inclusion of the words "Under God") and *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803 (7th Cir. 2011) (unsuccessful Establishment Clause challenge to the statute creating the "National Day of Prayer").

---

[1] "The mere fact that some religious material [will be] presented does not establish that the 'principal or primary effect' of the [high school equivalent music] program was to advance religion." *Rogers v. Hellenbrand*, 118 F. App'x 80, 83 (7th Cir. 2004) (parenthetical supplied).

2

According to the Complaint, the Does, a father and a son who live in Elkhart, Indiana and who reside within the boundaries of the Concord Community Schools, are members of the FFRF and share its goals and values.  (D. # 1; Complaint, ¶ 27-29).

**B.       The Defendant, Concord Community Schools.**

The Defendant, Concord Community Schools, is located in North Central Indiana with boundaries in large portions of Elkhart County, and serves approximately 5,300 students from four elementary schools, one intermediate school, one junior high school, and one high school. The School's administrative offices are located at 59040 Minuteman Way, Elkhart, Indiana 46517.  The School's website can be found at http://www.concord.k12.in.us.  (Spradling Aff'd., ¶ 2).

The School operates under the direction and control of a five (5) member Board of School Trustees.  Indiana law provides that the School Board is the ultimate decision-maker for the School (I.C. § 20-23-4-26, I.C. § 20-26-5-4, I.C. § 20-26-3-1 through 6) and the School Board exercises this authority through a series of policies for the School and its employees.  The School's policies and procedures may be viewed at http://www.neola.com/concord-in. (Spradling Aff'd., ¶ 3).

One of the policies enacted by the School Board is Board Policy 2240, entitled "Controversial Issues".   This policy contains an "opt-out" provision that allows parents who object to a portion of the educational curriculum to opt their students out of that portion of a class without penalty:

> The Board recognizes that a course of study or certain instructional materials may contain content and/or activities that some parents find objectionable. If after careful, personal review of the program lessons and/or materials, a parent files a complaint in accordance with Board Policy 9130 regarding either the content or activities that conflict with his/her religious beliefs or value system, the school will honor a written request for his/her child to be excused from a particular class for specified reasons. The student, however, will not be excused from

3

participating in the course and will be provided alternate learning activities during times of such parent-requested absences.

(Spradling Aff'd., ¶ 3; Exhibit "A").

### C.     The Concord Performing Arts Department.

Unlike many schools that focus on extracurricular athletics, Concord has historically had a very strong performing arts program.   As noted in the Complaint, "the Performing Arts Department 'involves approximately half of the School's 1,500 students at the high school. Students are involved in marching band, 3 concert bands, 2 jazz bands, pep band, string orchestra, symphony orchestra, 6 choirs, piano, and dance.'"  (D. # 1; Complaint, ¶ 12; *quoting* http://www.concordmusic.info; Spradling Aff'd., ¶ 4).

In addition to the music programs, the Performing Arts Department includes other performance based courses, including classes or programs in dance, theater and stagecraft. (Spradling Aff'd., ¶ 4; Exhibit "B").  As part of its educational program, the Concord High School Performing Arts Department presents a variety of programs throughout the school year that allow high school students to experience performing in front of live audiences.  These programs include the following:

- An annual high school musical which, for the 2014-15 school year was the musical Footloose.

- An annual Carnival Variety Show featuring all components of the music, choral and dance programs.

- An annual All School Band Festival featuring all components of the band program.

- An annual Choral Music Pops Concert featuring all components of the choral program.

- An annual Jazz Café Show that features the jazz band and various other performers.

- An annual Christmas Spectacular featuring all components of the music, choral and dance programs.

(Spradling Aff'd., ¶ 5; Exhibits "C-1" through "C-6").

### D.  The Christmas Spectacular.

As noted above, one aspect of the Performing Arts Department's program is the annual "Christmas Spectacular."  The Christmas Spectacular is designed as a holiday program that has three purposes:

- To act as the culmination of the fall semester's music instruction by presenting a multi-pronged musical performance incorporating all aspects of the High School's music offerings, including band, orchestra, and choral components as well as to incorporate other aspects of the Performing Arts Department such as dance, theatre, and stagecraft;

- To provide music students with challenging and instructive live music performance opportunities in front of a large audience; and,

- To provide educational instruction to both music students, the general student population, and the general population as a whole regarding the traditional underpinnings of the holidays (such as Chanukah, Kwanza, and Christmas) celebrated during the season.

In the present case the FFRF is challenging a Christmas Spectacular that is in its 45th year of performance, and was developed based on the "Christmas Spectacular" that has been performed at the Radio City Music Hall for the last eighty-five (85) years. (Spradling Aff'd., ¶ 6).  "The Radio City Music Hall's performance is "America's #1 holiday production, the Christmas Spectacular is attended by more than one million people annually and has played to 74 different cities outside of New York with its regional touring production.  Since 1932, the Christmas Spectacular has played at the famed Radio City Music Hall and today's show still features beloved favorite numbers, including Parade of the Wooden Soldiers and the Living Nativity, which have been performed since its inception."  http://www.radiocity.com/about/history.html.

Over time the Concord Christmas Spectacular has parted ways with the Radio City version as the educational needs of a performing arts program have taken precedence over a pure entertainment product and as the School has attempted to freshen up the program and bring it to a more modern and diverse audience and student population.  *Id.*, ¶ 7.

In recent years this holiday event has merged several educational and performing ensembles within Concord's Performing Arts Department. Ensembles that typically perform include two string orchestras, a symphony orchestra, a concert band, two jazz bands, five choirs, and small chamber groups. It also includes various dance teams, students from the drama program, and stage technicians.  The Performing Arts Department presents five sold-out holiday concerts which involve over 600 students as either performers or technical support.  (Spradling Aff'd., ¶ 8).

### E.       Design of the Christmas Spectacular.

Logistical planning for the Christmas Spectacular usually begins in August.  Rehearsals historically begin in October with more intensive preparation developing in late October largely depending on when the Marching Band season concludes.  This year the Marching Minutemen have qualified for the ISSMA State Marching Band Finals, to be held at Lucas Oil Stadium in Indianapolis, Indiana on November 7, 2015. (Spradling Aff'd., ¶ 9).  Because of the success of the Marching Band, selection of the music and program design have been pushed back into early November.  *Id.*, ¶ 10.

Preparation for the event includes selecting music that will challenge and educate the students in music performance and pedagogy.  The music selections help students learn about holiday music through historical and cultural context.  The performance of the music is also intended to provide an enjoyable auditory experience.  (Spradling Aff'd., ¶ 11).

In addition to the music portion of the program, it is also important for the Christmas Spectacular to highlight other aspects of the Performing Arts Department's program, including dance and theatre.   The drama and stagecraft students are involved in transforming the performing arts center into a holiday wonderland that delights young and old.  Artistic vision is a high priority in developing the program so that the students and the audience can experience a holiday event that is aesthetically invigorating.  (Spradling Aff'd., ¶ 12).

As a part of the program students learn to create costumes, stage props, and stage lighting.  They also build or procure large Christmas trees, giant reindeer, thirty (30) to forty (40) pre-lit Christmas trees, plastic snow, snow machines and set construction  are all designed and assembled. The front of the stage and the balcony are adorned by these students with garland, lights, and ornaments. Over five hundred (500) strands of lights are hung throughout the auditorium. (Spradling Aff'd., ¶ 13).

As part of the program students are also encouraged to audition for special solos and small groups to further enhance the educational challenge presented by a program of this sort. (Spradling Aff'd., ¶ 14).

The Christmas Spectacular also serves as an annual outreach activity designed to interest students at the four Concord Community elementary schools and the Concord Intermediate School in the performing arts.  This outreach allows the high school students to experience performing in front of a live audience while allowing for constructive dialogue during the program to better prepare them for the public performances.  *Id.*, ¶ 15.  The program presented to the elementary school students only involves the first sixty minutes, the portion of program that has not been challenged in this case.  The latter part of the program, the portion after the intermission, is not employed in the elementary school presentation due to time constraints.  *Id.*

**F.      The 2015 Christmas Spectacular Program.**

Keeping the forgoing interests in mind, the 2015 Christmas Spectacular contains a wide variety of song selections (both vocal and instrumental) designed to challenge choir and instrumental students and provide opportunities for special solos, small group performances, and performance pieces.  These songs include:

- The Holly and The Ivy;
- Almost Christmas;
- That's Christmas to Me;
- One More Sleep;
- Underneath the Tree;
- December Prayer;
- Winter Wonderland;
- Text Me Merry Christmas;
- Santa's Workshop;
- Secret Agent Santa;
- White Winter Hymnal;
- Christmas Eve/Sarajevo 12/24;
- Jingle, Jangle Bells;
- A Mad Russian's Christmas;
- Parade of the Wooden Soldiers;
- Let it Snow;
- Big Noise from the North Pole;
- It's Our Christmas Cheer;
- White Christmas;
- Ani Ma'amin, Harambee;
- One Amazing Night;
- Christmas Medley consisting of one verse each from A Medieval Christmas; Angels We Have Heard On High; O Little Town of Bethlehem; Jesus, Jesus, Rest Your Head; Away in a Manger; Noel, O Holy Night; We Three Kings; Peace, Peace; and Hark, the Herald Angels Sing.

(Spradling Aff'd., ¶ 16; Exhibit "D").

Several of the pieces incorporate musical numbers with performances by other elements of the Performing Arts Program.  For example, the dance program is incorporated in the "Santa's Workshop" piece which is performed by the Concord Dance Team, and the "Parade of Wooden

Soldiers" incorporates the entire dance team.  The stage design, the lighting, the costume manufacture, and the "Living Nativity" are all designed to incorporate the theatre and stagecraft programs with students creating the costumes, the sets, and the lighting as well as actually portraying various characters.  (Spradling Aff'd., ¶ 17; Exhibit "D").

The 2015 Christmas Spectacular is scheduled to run ninety (90) minutes with a fifteen (15) minute intermission.  The first portion of the program, titled "The Magic of the Season" lasts approximately sixty (60) minutes.  The post-intermission portion of the program entitled the "Spirit of the Season" lasts approximately thirty (30) minutes and includes a brief historical narration and music from each of the three major holidays celebrated during the season, Chanukah, Kwanza, and Christmas.   (Spradling Aff'd., ¶ 18; Exhibit "D").

The Christmas portion of the "Spirit of the Season" is scheduled to last approximately nineteen (19) minutes and contains a medley of traditional Christmas Carols, with some portions acted out by drama students, including the shepherds from "Angels we Have Heard on High", the three kings from "We Three Kings", and a "Living Nativity" from "Away in a Manger." These actors are on stage for approximately the last twelve (12) minutes of the program. (Spradling Aff'd., ¶ 19; Exhibit "D").  Thus the challenged portion of the program makes up only 13% of the overall Christmas Spectacular program.  Moreover, when the other five ninety-minute music/theatre performances throughout the remainder of the year are included, the challenged portion of the School's overall performing arts program totals only 2%, effectively "*de minimis* religious references."  *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 590 (6th Cir. 2015).

Outside of a brief historical perspective of the holiday told in narrative form by a student before each of the three holiday performances, Chanukah, Kwanza, and Christmas, there is no

further oral reading, and specifically no reading from any religious texts of any kind. (Spradling Aff'd., ¶ 20).

### III.    Discussion.

#### A.    Preliminary Jurisdictional Issue based on Ripeness.

As an initial matter, as noted earlier, there is a jurisdictional problem with the FFRF's challenge to the 2015 Christmas Spectacular.  They have brought it too early based on last year's program, and not based on this year's program.

The FFRF's claim as originally filed was not "ripe" in that on October 7, 2015, the 2015 Christmas Spectacular's program had not been established, indeed the program is not generally set until after the conclusion of the marching band season, which for Concord will not be until after the State Finals on November 7, 2015.  The problem with bringing a challenge to the 2015 program based on what happened in 2014, is that the 2015 program is substantially different from the 2014 program.

The difference between a mootness argument and a ripeness argument was concisely set out by the 7th Circuit in *Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010):  "To say that a claim is moot is to say that it is too late for the judiciary to affect anyone's entitlements.  With respect to Bauer's claim, however, the suit is too early rather than too late. It is unripe, not moot."  *Id.*, 620 F.3d at 708.  In *Bauer* the 7th Circuit held that the case was not moot since the 2008 election had passed and circumstances had changed.  Instead the Court viewed the matter as a ripeness issue since the challenge focused on what might happen in the upcoming 2010 elections.  Because a series of events had to take place before the individual judges were subjected to discipline arising out of the 2010 election, the 7th Circuit held that the case was not ripe for adjudication.

Similarly, in the Establishment Clause arena, the Fifth Circuit in *Staley v. Harris Cnty., Tex.*, 485 F.3d 305, 309 (5th Cir. 2007) noted as follows:

> Additionally, any dispute over a probable redisplay of the Mosher monument is not ripe because there are no facts before us to determine whether such a redisplay might violate the Establishment Clause. Indeed, no decision has been made regarding any aspect of the future display of the monument. In the absence of this evidence, we are unable to conduct the fact-intensive and context-specific analysis required by *McCreary* and *Van Orden*. Thus, any claim that the Establishment Clause may be violated after the Courthouse and grounds have been renovated, is not ripe for review. *See United States v. Carmichael*, 343 F.3d 756, 761 (5th Cir. 2003) ("A claim is not ripe for review if 'it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (*citing Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted))).

*Staley*, 485 F.3d at 309. *See also Wheeler v. Barrera*, 417 U.S. 402, 426-27 (1974) (noting, in an Establishment Clause challenge to certain types of school funding, that "[i]t would be wholly inappropriate for us to attempt to render an opinion on the First Amendment issue when no specific plan is before us. A federal court does not sit to render a decision on hypothetical facts, and the Court of Appeals was correct in so concluding.")

The present case is no different. At the time the Complaint was filed on October 7, 2015, the program for the 2015 Christmas Spectacular had not yet been set because of the length of the Marching Band Season. (Spradling Aff'd., ¶¶ 9-10). This is significant. As Mr. Spradling has noted in his Affidavit, while the original program was designed based on the Radio City Music Hall program, in recent years he has been making changes to the program: "Over time the Concord Christmas Spectacular has parted ways with the Radio City version as the educational needs of a performing arts program have taken precedence over a pure entertainment product. These changes have accelerated over recent years as I have been attempting to freshen up the program and bring it to a more modern and diverse audience and student population." *Id.*, ¶ 7.

Indeed as one can see from the draft 2015 Christmas Spectacular program attached as Exhibit "D" to the Spradling Affidavit, there have been significant and substantive changes to the program which likely nullify the concerns expressed in the original Complaint that was filed,

essentially making this preliminary injunction request an exercise in futility.  The FFRF's claims were not and are not ripe until the final program has been completed.  Had the FFRF waited until the program had been finalized, rather than filing their claim before the program had even been drafted, relying on what happened in 2014, much of what has gone on would have been avoided. This is, of course, why ripeness is a jurisdictional requirement.  The presumption that the 2015 program would be identical to the 2014 program is too big a leap.  As noted in *Bauer* "[t]hat's too many unlikely steps to justify constitutional adjudication."  *Id.*, 620 F.3d at 708.

In the present case, as in *Bauer*, *Staley*, and *Barrera* this Court lacks jurisdiction over this matter because the claims are not yet ripe for adjudication by it.  "We modify the district court's judgment to provide that the challenge to the 2008 version of the Code is dismissed as unripe, not as moot.  As modified, the judgment is AFFIRMED."  *Bauer*, 620 F.3d at 718.

## B.        Preliminary Injunction Standard.

Obtaining an injunction, particularly a preliminary injunction, is a difficult task.  "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)(quoting 11 Charles Alan Wright *et al.*, Federal Practice and Procedure, § 2948, at 129-130 (2d ed. 1995)).

The parties concur on the burden that the FFRF must carry in order to obtain a preliminary injunction, "[t]he 'threshold' phase requires the moving party to establish that he will suffer irreparable harm if a preliminary injunction is not issued, (2) that he has no adequate legal remedy, and (3) there is some likelihood he will succeed on the merits."  *Ezell v. City of Chicago,* 651 F.3d 684, 694 (7th Cir. 2011).  *See* D. # 18; Plaintiffs' Brief, p. 7-8.

**C.    "Likelihood he will succeed on the merits."**

In the Complaint the FFRF seeks to enjoin the performance of the Christmas Spectacular based on a single claim: "Legal Claim – The portion of the Christmas Spectacular with the Live Nativity Scene and the telling of the story of the birth of Jesus violates the Establishment Clause of the First Amendment to the United States Constitution." (D. # 1; Complaint, ¶ 34).

This claim is fundamentally flawed because the FFRF cannot demonstrate "(1) a likelihood that it will prevail on the merits of the lawsuit" and thus it is not entitled to any form of declaratory or injunctive relief.  *Incredible Technologies v. Virtual Technologies*, 400 F.3d 1007, 1011 (7th Cir. 2005).  Moreover, these flaws also warrant the dismissal of the Complaint as a matter of law.

> 1.    Selection of the appropriate framework to analyze the Establishment
>       Clause claim and the applicability of the so-called "coercion test."

The Establishment Clause states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1.  The Establishment Clause was made applicable to schools such as Concord through the application of the Fourteenth Amendment. *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 849 (7th Cir. 2012)(*en banc*)(*citing Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947)).

To put it charitably, the Supreme Court has been less than clear as to the appropriate framework to apply to Establishment Clause cases.  As one court noted with some frustration:

> Throughout the turbid history of Establishment Clause jurisprudence, the Supreme Court has announced no less than four judicially crafted "tests" to analyze whether governmental action violates the Constitution: the three-part "Lemon test" derived from *Lemon v. Kurtzman*, 403 U.S. 602 (1971); the "endorsement test" first advanced by Justice O'Connor in *Lynch v. Donnelly*, 465 U.S. 668, 687–94 (1984) (O'Connor, J., concurring) and later interpreted as essentially the second *Lemon* prong; the "coercion test" pronounced in *Lee v. Weisman*, 505 U.S. 577 (1992) and applied in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000); and the "legal judgment test" formulated by

13

> Justice Breyer is his concurrence in *Van Orden v. Perry*, 545 U.S. 677, 698–706,
> (2005) (plurality) (Breyer, J., concurring). Several members of the Supreme Court
> have also theorized that other tests should govern, although their proposals have
> not garnered majority support.

*Freedom From Religion Found., Inc. v. New Kensington-Arnold Sch. Dist.*, 919 F. Supp. 2d 648,

653 (W.D.Pa. 2013).    Indeed, members of the Supreme Court have expressed a similar

frustration.  In dissenting from the denial of a writ of *certiorari*, Justice Thomas referred to an

"Establishment Clause jurisprudence in shambles" and noted that "[o]ur jurisprudence provides

no principled basis by which a lower court could discern whether *Lemon* / endorsement, or some

other test, should apply in Establishment Clause cases."  *Utah Highway Patrol Ass'n v. Am.*

*Atheists, Inc.*, -- U.S. --, 132 S. Ct. 12, 14 (2011).

Nevertheless the Seventh Circuit has noted that in this circuit the three-pronged test set

out in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) "'remains the prevailing analytical tool for the

analysis of Establishment Clause claims.'"  *Elmbrook*, 687 F.3d at 849.  Under the *Lemon* test a

challenged activity violates the Establishment Clause if it: (1) lacks a legitimate secular purpose;

(2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive

governmental entanglement with religion.  *Lemon*, 403 U.S. at 612–13.[2]

Having said that, the *Elmbrook* court then went on to analyze the case using at least three

of the aforementioned tests, the modified *Lemon* test, the endorsement test, and at least in part,

the "coercion test."

The FFRF devotes a fairly large chunk of its brief to the "coercion test", arguing that it is

a separate and independent basis upon which to find an Establishment Clause violation.  (D. #

---

[2] Over time the "entanglement" prong has been subsumed within the "effect" prong, at least in the school context:
"[T]he Court has 'recast *Lemon's* entanglement inquiry [in the public school context] as simply one criterion
relevant to determining a statute's effect.'  *Mitchell v. Helms*, 530 U.S. 793, 808 (2000) (plurality opinion) (*citing
Agostini v. Felton*, 521 U.S. 203, 232–33 (1997))."  *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 587
(6th Cir. 2015).

18; Plaintiffs' Brief, p. 10-14).  There are several flaws with such an argument in the present case.

First, the 7th Circuit in *Elmbrook* clearly indicated that coercion was generally just a sub-element of the standard *Lemon* test noting that coercion and endorsement "are two sides of the same coin."  *Id.*, 687 F.3d at 855.  The Court also went on to limit the application of a separate "coercion test" to situations "when the government directs students to attend a pervasively Christian, proselytizing environment."  *Id.*  This limitation is consistent with statements made in the seminal case of *Lee v. Weisman*, 505 U.S. 577 (1992) where an invocation and benediction prayer were delivered by a rabbi during a high school graduation ceremony.  *Id.*, 505 U.S. at 580.  In analyzing the constitutionality of the prayer, the *Lee* Court adopted and applied what has now been characterized as the coercion test:   "[A]t a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise."  *Id.*, 505 U.S. at 587.  The Court in *Lee*, however, expressly confined its holding to express formal religious exercises at schools. "These dominant facts mark and control the confines of our decision:  State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools."  *Id.*, 505 U.S. at 586; *see also id.* at 599 ("The sole question presented is whether a religious exercise may be conducted at a graduation ceremony ....").  Evidence of this limitation is the fact that the *Lee* court did not identify any problems with the recitation of the Pledge of Allegiance, with "under God" in it at the same graduation ceremony immediately before the challenged prayer.  *Id.*, 505 U.S. at 583.

In the present case the 2015 Christmas Spectacular is far from "[s]tate officials direct[ing] the performance of a formal religious exercise" at school.  Nor can the Spectacular in any way be characterized as "a pervasively Christian, proselytizing environment" as the

15

*Elmbrook* Court required before considering the application of the "coercion test."  *Elmbrook*, 687 F.3d at 855.  Without this type of an environment the "coercion test" simply does not apply.

It is also important emphasize the unique facts underpinning the *Elmbrook* case that caused it refer to the situation as a "pervasively Christian, proselytizing environment" and to distinguish them from the facts in this case as a District Court in South Carolina recently did:

> In *Elmbrook*, the venue for the graduation ceremony included not only the presence of religious imagery upon driving up to the graduation ceremony location, but also tables in the lobby where the graduates congregated filled with evangelical literature, much of which addressed children and teens; religious banners, symbols, and posters; a large circular desk displaying pamphlets directed to young adults, middle school ministry, and high school ministry; church members manning the information booths containing the religious literature; church members passing out literature in the lobby; a large Latin cross hung over the dias at the front of the chapel and dominating the proceedings; bibles and hymnal books in the pews; and donation envelopes.  *Elmbrook*, 687 F.3d at 846. The court found the "environment was pervasively Christian, obviously aimed at nurturing Christian beliefs and gaining new adherents among those who set foot inside the church." *Id.* at 853.  Key in the court's holding was its finding that the environment was a "pervasively Christian, proselytizing environment."  *Id.* at 855. The court in *Elmbrook* was clear, however, that its opinion should not be read as critical of cases permitting governmental use, in the proper context, of certain church-owned facilities.  *Id.* at 843.

*Am. Humanist Ass'n v. S. Carolina Dep't of Educ.*, 2015 WL 1268036, at *9 (D.S.C. 2015).

Such an environment is obviously far different from that posed in this case.

The second problem with utilizing a "coercion test" framework, if one exists independent of the *Lemon* endorsement analysis, in this case is that such a test is applicable only where "the government **directs** students to attend a pervasively Christian, proselytizing environment" and where "the school district creates a **captive** audience, the coercive potential of endorsement can operate."  *Elmbrook*, 687 F.3d at 855 (emphasis supplied).  While the FFRF Brief glosses over this fact with a passing reference in a footnote (D. # 18; FFRF Brief, p. 14, n. 2), the simple fact is that School Board Policy 2240 specifically allows students such as Jack Doe to "opt-out" out

of any portion of the educational curriculum if it presents any "conflict with his/her religious beliefs or value system" without penalty.   Under these circumstances Jack Doe would be permitted to participate in "alternate learning activities during times of such parent-requested absences."  (Spradling Aff'd., ¶ 3; Exhibit "A").   Thus the core element for the "coercion test", a "captive" audience that has been "directed" to attend an express religious exercise is absent, and without this type of an environment the "coercion test" simply does not apply.

> ### 2.      Application of the modified *Lemon* test, "endorsement" of religion.

In cases such as this, which involve public displays, relying on Supreme Court precedent, the Seventh Circuit in *Elmbrook* utilized a slightly modified version of the *Lemon* test which, applying the "primary effect" prong, focused on whether the challenged practice has "the effect of communicating a message of government endorsement or disapproval of religion."  *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984)(O'Connor, J., concurring).   This endorsement approach requires the Court to "assess[ ] the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion."  *Books v. City of Elkhart, Indiana*, 235 F.3d 292, 304 (7th Cir. 2000) (parenthetical supplied) ("*Books I*").   Or to put it slightly differently, "whether an objective, reasonable observer, 'aware of the history and context of the community and forum in which the religious display appears,' would fairly understand the display to be a government endorsement of religion."  *Books v. Elkhart County, Indiana*, 401 F.3d 857, 867 (7th Cir. 2005) ("*Books II*").

In making the assessment it is important to again note that the Complaint's allegations and the FFRF's materials all erroneously focus on the 2014 Christmas Spectacular and not the program for the 2015 Christmas Spectacular.  Key differences between the two include the fact that the 2015 Christmas Spectacular does not contain "a faculty-member (acting as narrator) recit[ing] the story [of the birth of Jesus] as it appears in the Christian Bible (Luke 2:6-14 and

Matthew 2:1-11)." (D. # 1; Complaint, ¶ 18).  Indeed there is no faculty reading or narration at all.  (Spradling Aff'd., ¶ 20).  A second key difference is the allegation that "no faith other than the Christian Faith has ever been represented in performances staged at the Christmas Spectacular." (D. # 1; Complaint, ¶ 22).  The 2015 "Spirit of the Season" portion of the Christmas Spectacular recognizes the three major holidays in December, Chanukah, Kwanza, and Christmas, with a brief historical perspective through narration by a student and music and symbols from each tradition. (Spradling Aff'd., ¶ 20).

With these significant differences in mind we turn to the specifics of the *Lemon* test to determine whether the program endorses a specific religion.

### i.    The "Purpose Prong" of the Lemon Test.

The initial inquiry under the modified *Lemon* test is whether the 2015 Christmas Spectacular, as a whole, has the primary purpose of "advancing or inhibiting religion." *Agostini v. Felton*, 521 U.S. 203, 222–23 (1997).  As the Supreme Court has explained, "'[t]he purpose prong of the *Lemon* test asks whether the government's actual purpose is to endorse or disapprove of religion.'" *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (*quoting Lynch*, 465 U.S. at 690).  In determining whether the 2015 Christmas Spectacular can be said to have a valid secular purpose, the Court will need to evaluate the totality of the circumstances surrounding the creation and production of the performance.

The fact that the 2015 Christmas Spectacular uses the word Christmas is not, in and of itself, enough to strip it of a secular purpose.[3]  Schools such as Concord have traditionally

---

[3] *See e.g. Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 545 (10th Cir. 1997) ("Courts have long recognized the historical, social and cultural significance of religion in our lives and in the world, generally. . . . For example, it is recognized that a significant percentage of serious choral music is based on religious themes or text. Any choral curriculum designed to expose students to the full array of vocal music culture therefore can be expected to reflect a significant number of religious songs.") and *Hellenbrand*, 118 F. App'x at 83 ("The mere fact that some religious material [will be] presented does not establish that the 'principal or primary effect' of the [high school equivalent music] program was to advance religion.").

acknowledged a wide variety of holidays, some that have religious origins and significance, others that do not. Teachers and students typically prepare displays, study the origin of holidays and participate in plays or concerts.  While some of these holidays have religious origins and retain a religious significance, others do not, and they all have also become part of our national culture and heritage.

The courts have also recognized that schools may choose to recognize these holidays, and teach their students objectively about them, including their religious significance, without offending the Establishment Clause when presented as part of an overall secular education program.  *Florey v. Sioux Falls Sch. Dist.,* 619 F.2d 1311 (8th Cir.), *cert. denied*, 449 U.S. 987 (1980).  In *Florey*, the Eighth Circuit upheld a school's holiday policy, noting that it was constitutionally permissible for a school to "advance the students' knowledge and appreciation of the role that our religious heritage has played in the social, cultural and historical development of civilization."  *Id.*, 619 F.2d at 1314.  *See also Clever v. Cherry Hill Township Bd. of Educ.,* 838 F.Supp. 929 (D.N.J. 1993) which considered the constitutionality of a school board's policy regarding "the use of cultural, ethnic, or religious themes in our educational program."  *Id.*, 838 F.Supp. at 932.  The court upheld the policy for a variety of reasons, observing that "the use of appropriate classroom and central displays is clearly a recognized and legitimate educational technique."  *Id.*, 838 F.Supp. at 939.

The case law clearly suggests that context can be important to assure fair balance and sensitivity to all students in these circumstances. A musical program consisting solely of religious music, for example, is more problematic than a program that combines religious and secular music.  *See e.g. R.J.J. v. Shineman,* 658 S.W.2d 910, 913 (Mo.Ct.App. 1983) (winter holiday concert constitutional where seasonal numbers such as "Jingle Bells" performed along

19

with traditional Christmas carols).  *See also County of Allegheny v. ACLU,* 492 U.S. 573 (1989) (display of menorah next to Christmas tree acceptable whereas display of crèche alone would be impermissible under the Establishment Clause); *Lynch v. Donnelly,* 465 U.S. 668 (1984) (context of the crèche display is critical).

In the present case the core challenge in the Complaint that is applicable to the 2015 Christmas Spectacular appears to involve the "Living Nativity" scene.  How the nativity scene is displayed is critical to the determination of whether it "supports and promotes the Christian praise to God that is the crèche's religious message."  *Allegheny County,* 492 U.S. at 600. A nativity scene may be displayed as one item among many secular symbols of Christmas and will meet constitutional muster.  *See Lynch,* 465 U.S. at 685–686. However, isolating a nativity scene in such a way as to show government solidarity with the Christian faith violates the Establishment Clause.  *See Allegheny County,* 492 U.S. at 598–599.

The application of the *Lemon* test in the context of a school holiday program with a similar living nativity scene was addressed in *Doe v. Wilson Cnty. Sch. Sys.*, 564 F. Supp. 2d 766 (M.D.Tenn. 2008).

> In this case, in the main secular portion of the Christmas program, students assumed roles with costumes and special clothing, including members of the chorus, the reader, soloist, ballerinas, toy doll, toy soldier, Santa Clause, jack-in-the-box, teddy bear, reindeer, Rudolph, and a mouse. It was much more of an extravaganza with more student participation and fanfare than the rather meager, stark nativity scene placed at the very end. The nativity scene included at the end of the Christmas program was an example of the religious heritage of the holiday and was very limited in duration as compared to the balance of the program. Unlike in the secular presentation, there were no words spoken by the students or narrated by others in the ending portion of the program.  The Court concludes that the nativity scene was presented in a prudent, unbiased, and objective manner to present the traditional historical, cultural, and religious meaning of the holiday in America.
>
> Christmas is a national religious holiday, celebrated on December 25. To Christians, the holiday commemorates the birth of a man named Jesus, who was

also called Christ, from which the holiday derives its name. The Biblical account of Jesus' birth is that he was born in a crib or manger to mother Mary and father Joseph. This is represented by the nativity scene. This is a recorded historical event, but the birth of Jesus also is the center of the religious faith of Christians.

Each scene of the secular portion of the Christmas program included props, animal and storybook characters, customs or designated dress, songs, narratives, or spoken parts. Those in the audience clapped and took pictures of the participating students as they sang and acted out their parts. The brief nativity scene lasted only two minutes, less than 10% of the program, with no acting, speaking or narrative. Considering the Christmas program as a whole, it was a secular performance with a bit of religious symbolism at the very end to reflect the historic, cultural and religious significance of the Christmas holiday. Taken as a whole, the inclusion of the nativity scene as a part of the program did not offend the Constitution.

*Doe v. Wilson Cnty. Sch. Sys.*, 564 F. Supp. 2d 766, 799-801 (M.D.Tenn. 2008).[4]

Thus the visual depiction of the "Living Nativity" falls into a fairly standard and frequently repeated legal analysis as noted above, and it depends on the context of the placement and the surrounding activities as well as the purpose of the display.

In the present case the express secular purpose of the "Living Nativity" and the program as a whole is to educate students regarding the various holidays celebrated during December, including Chanukah, Kwanza, and Christmas. Moreover, this is designed to be done within the context of the performing arts program as a whole utilizing all components of the program including choral music, band and orchestra instrumental music, dance and drama performances, and lighting and stagecraft. The Supreme Court has held that "the Court is normally deferential

---

[4] It is important to note that the *Wilson County* case found no endorsement with a "Living Nativity" in a kindergarten classroom, finding it did not constitute an unreasonable risk of government endorsement of religion to a kindergarten student. *Id.*, 564 F. Supp.2d at 784. "Courts thus have considered the more vulnerable nature of school-age children when analyzing the primary effect of state actions in the elementary school environment." *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1378-79 (9th Cir. 1994). With high school students, as we have in the present case, there is not the same concern that exists "for elementary school children, who are less informed, more impressionable and more subject to peer pressure than average adults." *Id.* Thus, "this Court will take into account that the present case involves high school students taking an AP course when applying the 'reasonable observer' test" in an Establishment Clause context. *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1039 (9th Cir. 2010). Surely if a Living Nativity does not pose the risk of endorsing religion to a kindergartener under this heightened standard, then a similar Living Nativity would not pose any problem in the high school context.

to a State's articulation of a secular purpose, [but] it is required that the statement of such purpose be sincere and not a sham." *Edwards v. Aguillard*, 482 U.S. 578, 586-87 (1987)(parenthetical supplied).

The "Living Nativity" in this case, as in the *Doe* case is just one small portion of the overall 2015 program and encompasses just about the same 10% figure.

> The Establishment Clause is not violated because government action "happens to coincide or harmonize with the tenets of some or all religions." *Harris v. McRae*, 448 U.S. 297, 319 (1980) (*citing McGowan v. Maryland*, 366 U.S. 420, 422 (1961)). In this case, the primary or principal effect of the use of the reading series at issue is not to endorse these religions, but simply to educate the children by improving their reading skills and to develop imagination and creativity. Any religious references are secondary, if not trivial. Therefore, the use of the series withstands scrutiny under this prong of the test.

*Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 689 (7th Cir. 1994).

Because the purpose of the 2015 Christmas Spectacular is secular and designed to promote various musical, dance and theatre performances as part of the School's performing arts curriculum and to educate students and the general public regarding the historical context of the three main holidays celebrated during December, the 2015 Christmas Spectacular complies with the purpose prong of the modified *Lemon* test.

ii.     The "Primary Effect Prong" of the Lemon Test – Living Nativity.

The second inquiry under the *Lemon* test is whether the 2015 Christmas Spectacular "has the primary effect of advancing or inhibiting religion." *Lemon*, 403 U.S. at 613. The Seventh Circuit has described this prong as follows:

> In *County of Allegheny*, the Court noted that, under this prong, courts have a special responsibility to ensure that a government-sponsored display does not have the purpose or effect of endorsing a religion. *See* 492 U.S. at 592. As we noted recently in *Freedom from Religion Foundation*, "[u]nder this test, 'the effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" 203 F.3d at 493 (*quoting Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)). When employing this analytical approach, we are charged with the responsibility

22

of assessing the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion.  *See County of Allegheny*, 492 U.S. at 597 (stating that "the government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends on its context").

*Books I*, 235 F.3d at 304.

As noted earlier, both "purpose" and "effect" under the test articulated in *Lemon* are viewed from the perspective of a reasonable observer who is informed of the text, context, and circumstances surrounding the challenged governmental act.  *McCreary Cnty., Ky. V. Am. Civil Liberties Union of Ky.,* 545 U.S. 844 at 862 (2005)("The eyes that look to purpose belong to an 'objective observer,' one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute or comparable official act.").[5]

It is also important to note that this analysis is not just some mathematical calculation, comparing the size and frequency of symbols.  Such a rote approach was rejected in cases such as *Am. Civil Liberties Union of New Jersey ex rel. Lander v. Schundler*, 168 F.3d 92 (3rd Cir. 1999) which noted that "any suggestion that these factors are dispositive for Establishment Clause purposes is belied by the Supreme Court's holding in *Allegheny County* that the display of a large menorah and one secular symbol, a Christmas tree, in front of the City–County Building in Pittsburgh was constitutional."  *Schundler*, 168 F.3d 92, 104-05.  As the Court so

---

[5] The fact that this challenge has occurred in the school context has little impact on the analysis:  "With this in mind, we must conjure a slightly different objective observer for purposes of challenges to a school district's conduct. The Supreme Court has in one case considered an Establishment Clause challenge from the perspective of 'an objective Santa Fe High School student,' *see Santa Fe*, 530 U.S. at 308. In another First Amendment case, this court has analyzed whether 'students, parents, and members of the public might reasonably perceive' that government conduct 'bear[s] the imprimatur of the school.' *See Roberts v. Madigan*, 921 F.2d 1047, 1057 (10th Cir. 1990) (*quoting Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988)). In yet another case, the Supreme Court expressly declined any Establishment Clause standard that would bar 'a group's religious activity ... on the basis of what the youngest members of the audience might misperceive.' *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 119 (2001). Notwithstanding these varying articulations, each of these cases seems to be focused on the same standard: an objective standard based on reasonableness and informed knowledge, with due consideration for the concern that school children will see the governmental message or symbol."  *Weinbaum v. City of Las Cruces, N.M.*, 541 F.3d 1017, 1032 (10th Cir. 2008).

elegantly put it, such a mathematical approach leads to the absurd result of analyzing "how many candy canes offset one Jesus?" *Id.*

This endorsement inquiry is a "highly fact-specific test" that requires a court to ascertain whether "a reasonable observer of the display in its particular context [would] perceive a message of governmental endorsement or sponsorship of religion." *Allegheny*, 492 U.S. at 593. *See also Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995). The Second Circuit in *Elewski v. City of Syracuse*, 123 F.3d 51 (2nd Cir. 1997) noted that "[t]hus, if a [religious symbol's] context—like the context of the crèche in *Lynch* or that of the menorah in *Allegheny*—neutralizes the message of governmental endorsement, then the [religious symbol] passes muster under the Establishment Clause." *Elewski*, 123 F.3d at 54. The context is important because "it is not the simple exposure to religious symbols that is constitutionally impermissible; rather, it is the message conveyed, particularly to impressionable youngsters, by linkage of such symbols to their public school." *Spacco v. Bridgewater School Dept.*, 722 F.Supp. 834, n. 1 (D.Mass. 1989) (*citing Larkin v. Grendel's Den. Inc.*, 103 S.Ct. 505 (1982), and *Allegheny*, 492 U.S. 573)).

The simple fact is that the "Living Nativity" is a very small portion (12%) of a secular program celebrating the holidays that is rife with other secular performances, other religious and holiday songs and symbols and only 2% of the entire annual performing arts music performances. Within this context using "an objective standard based on reasonableness and informed knowledge, with due consideration for the concern that school children will see the governmental message or symbol" the "Living Nativity" does not have the primary effect of endorsing religion any more than the menorah did in *Allegheny County*.

24

One of the pillars of the FFRF's attack on the "Living Nativity" is their reliance on the contention that it is performed with a scriptural reading.  Relying on cases finding that school officials reading the Bible in school violates the Establishment Clause, the FFRF goes on to note in its challenge to the "Living Nativity" that "[t]here is no useful distinction between a scriptural reading and a religious performance *containing* a scriptural reading." (D. # 18; FFRF Brief, p. 14; emphasis in original).  The problem, of course, is that the 2015 Christmas Spectacular contains no Bible reading at all.  Indeed the only narrative in that portion of the program is a brief historical context done by a student for each of the three holidays for which songs are performed, Chanukah, Kwanza and Christmas.  (Spradling Aff'd., ¶ 20).

Within this context "a reasonable observer of the display in its particular context [would not] perceive a message of governmental endorsement or sponsorship of religion."  *Allegheny*, 492 U.S. at 593 (parenthetical supplied).

   iii.  *The "Primary Effect Prong" of the Lemon Test – Religious Songs.*

While the FFRF also mentions the fact that "various religious hymns—either singing or instrumentally—such as 'Christ in the Manger', 'Silent Night', and 'Hark! The Herald Angels Sing'" are in the program, it is unclear whether they are actually challenging that music in particular, or just using it as a "contextual" element supporting the overall effect of the "Living Nativity." (D. # 18; FFRF Brief, p. 16-17).  As noted in the Spradling Affidavit, in conjunction with a five minute Chanukah narrative and musical performance, and a five minute Kwanza narrative and musical performance, the Christmas portion of the "Spirit of the Season" contains a medley of traditional Christmas Carols.  (Spradling Aff'd., ¶¶ 18-20).

If such a challenge to the music is indeed being made, it will not succeed as the courts have almost unanimously rejected challenges to the singing of religious choral music utilizing

the purpose/effect prongs of the *Lemon* test.  As the Fifth Circuit noted in *Doe. v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402 (5th Cir. 1995):

> Neither does utilizing The Lord Bless You and Keep You as a theme song advance or endorse religion.  The Does do not argue that the choir sings the theme song as a religious exercise *per se* so we do not accept the notion that repeated singing of a particular religious song amounts to an endorsement of religion. At trial, Mr. McCullar estimated that 60–75 percent of serious choral music is based on sacred themes or text.  Given the dominance of religious music in this field, DISD can hardly be presumed to be advancing or endorsing religion by allowing its choirs to sing a religious theme song.  As a matter of statistical probability, the song best suited to be the theme is more likely to be religious than not.  Indeed, to forbid DISD from having a theme song that is religious would force DISD to disqualify the majority of appropriate choral music simply because it is religious.  Within the world of choral music, such a restriction would require hostility, not neutrality, toward religion

*Id.*, 70 F.3d at 407-08.  The Court went on to note:  "A position of neutrality towards religion must allow choir directors to recognize the fact that most choral music is religious.  Limiting the number of times a religious piece of music can be sung is tantamount to censorship and does not send students a message of neutrality... .  Such animosity towards religion is not required or condoned by the Constitution."  *Id.*

Virtually every court that has been asked to review year-end holiday concerts or musical programs that have included religious music or music associated with religious holidays has upheld those programs against identical Establishment Clause challenges.  *See e.g.*, *Florey*, 619 F.2d at 1314 (holding that the study and performance of religious songs in the public schools, including the singing of Christmas carols, is constitutional); *Bauchman*, 132 F.3d at 543 (selecting explicitly Christian religious music and Christian religious sites for performance by the high school choir did not violate the Establishment Clause); *Curley v. Arpaio*, 2010 WL 27923 (D.Ariz. 2010)(holiday music chosen by correctional officer to be played throughout prison during the Christmas season included both secular and non-secular songs from various

26

traditions, and the presence of secular melodies negated inmate's contention that officer's actions constituted a religious endorsement); *R.J.J. v. Shineman,* 658 S.W.2d 910 (Mo.Ct.App. 1983)(winter holiday concert constitutional where seasonal numbers such as "Jingle Bells" performed along with Christmas carols). *See also Stratechuk v. Bd. of Educ., S. Orange-Maplewood Sch. Dist*., 587 F.3d 597, 605 (3rd Cir. 2009) (noting that "cases from the Eighth, Tenth, and Fifth Circuits that upheld the constitutionality of performing religious music in public schools").

Because the "various religious hymns—either singing or instrumentally" are part of a program that includes a majority of overtly secular songs, there is no endorsement of religion from these songs.

Based on the foregoing, and applying the Lemon test as modified in this Circuit, "an objective, reasonable observer, 'aware of the history and context of the community and forum in which the religious display appears,' would [not] fairly understand the [2015 Christmas Spectacular] to be a government endorsement of religion." *Books II*, 401 F.3d at 867 (parenthetical supplied). As a consequence, the FFRF cannot demonstrate a "likelihood [it] will succeed on the merits." *Ezell*, 651 F.3d at 694.

## 2.     Irreparable Harm.

The Seventh Circuit has noted that "[i]t is not enough for the plaintiffs to show a likelihood of success on the merits. Critically, they must also show why they will suffer irreparable harm if the preliminary injunction they want does not issue." *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010).

"In the context of the grant of a preliminary injunction in this Circuit, irreparable injury has been defined as 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Figueroa v. Precision Surgical, Inc.*, 423 Fed.Appx. 205, 210 (3rd Cir. 2011).

27

The problem for the FFRF is that based on the content of the 2015 Christmas Spectacular it cannot show irreparable harm or injury.  Indeed it may well not be able to demonstrate an injury in fact thus undermining its standing as a whole.  The irreparable injury cited in the FFRF's preliminary injunction materials is "the denial of constitutional rights [which] is irreparable harm in and of itself." (D. # 18; FFRF Brief, p. 18).  In the present case, as discussed in detail above, the 2015 Christmas Spectacular passes the modified *Lemon* test, and thus there is no endorsement of religion and as a consequence, no Establishment Clause violation.  If there is no Establishment Clause violation, there has been no "denial of Constitutional rights" and there is no irreparable harm.  At best they simply do not like the fact that the program includes some religious themes with no endorsement of a specific religion.  That is not enough to confer a legal injury.

"Our plaintiffs are covered by the rule of *Valley Forge* and *St. Charles* that offense at the behavior of the government, and a desire to have public officials comply with (plaintiffs' view of) the Constitution, differs from a legal injury. The 'psychological consequence presumably produced by observation of conduct with which one disagrees' is not an 'injury' for the purpose of standing. *Valley Forge*, 454 U.S. at 485."  *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d 803, 807-08 (7th Cir. 2011).[6]

"We detect no irreparable injury that will be avoided through preliminary relief.  Bearing in mind that our review is under 'the highly deferential abuse of discretion standard,' we see no

_____

[6] It should be noted that with respect to the FFRF and John Doe there is no coercion element with respect to the Christmas Spectacular.  At best they simply have hurt feeling or feel slighted because they disagree with the contents of a public performance that they do not have to attend.  As Judge Easterbrook noted:  "[b]ut let us suppose that plaintiffs nonetheless feel slighted. Still, hurt feelings differ from legal injury. The "value interests of concerned bystanders" (*United States v. SCRAP*, 412 U.S. 669, 687 (1973)) do not support standing to sue."  *Freedom From Religion Found., Inc. v. Obama*, 641 F.3d at 807. Moreover, with respect to Mr. Doe, "[a] parent may be permitted to bring an action as the next friend of his or her children; however, for an action for themselves as well, parents must 'assert an injurious deprivation of their own legal rights or interests'. *Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 606 (5th Cir.2004)."  *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 505 (5th Cir. 2007*). See also Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004).

reason to upset the district court's decision to deny the preliminary injunction." *Judge*, 612 F.3d at 557.

3.      Balance of Harms.

The FFRF's argument on the balance of harms is bare bones.  They simply argue that "once a plaintiff demonstrates a likelihood of success on the merits" this prong is met.  (D. # 18; FFRF Brief, p. 19).  Similarly, as here, where they have not demonstrated a likelihood of success, they have not met their injunction burden.

However, there is also another very real harm in this case based on the timing and nature of the FFRF's claims, and that is the invitation to this Court to essentially run the School's performing arts program.

> This decision [*Lynch*], like others requiring multi-factor balances, gives judges of the inferior federal courts fits. The Court avoided creating a rule about the treatment of religious symbols and instead announced that judges should examine each symbol's context. But which items of the context matter? If different elements cut in different directions, what is to be done? It is discomfiting to think that our fundamental charter of government distinguishes between painted and white figures—a subject the parties have debated—and governs the interaction of elements of a display, thus requiring scrutiny more commonly associated with interior decorators than with the judiciary. When everything matters, when nothing is dispositive, when we must juggle incommensurable factors, a judge can do little but announce his gestalt.

*Am. Jewish Cong. v. City of Chicago*, 827 F.2d 120, 128-29 (7th Cir. 1987) (Easterbrook, J., dissenting).

**C.      Judgment on the merits.**

In addition to requesting that the Court deny the FFRF's prayer for declaratory and injunctive relief, the School also respectfully requests that the Court enter judgment in its favor on the merits of the Complaint.  As a general matter, courts have held that cases such as this are relatively amenable to summary judgment, assuming the facts are undisputed, since the standard to be applied is an objective one:

29

Finally, we address whether granting summary judgment on certain claims below was permissible under our Establishment Clause jurisprudence. Our *Lemon* endorsement test is an "objective inquiry," and we accordingly do not ask "whether particular individuals might be offended" by the government's conduct. *Bauchman*, 132 F.3d at 555. We need not sift through empirical evidence—polling data, statistics, or the like—because we need "not ask whether there is any person who could find an endorsement of religion ... or whether some reasonable person might think [the State] endorses religion." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) (O'Connor, J., concurring) (*quoting Ams. United for Separation of Church and State v. Grand Rapids*, 980 F.2d 1538, 1544 (6th Cir. 1992) (*en banc*)) (brackets in original). Instead, we must simply view the symbol through an objective observer's eyes.  Accordingly, the question can be decided as a matter of law, and is therefore appropriate for summary judgment on a sufficient record.  *See O'Connor*, 416 F.3d at 1231 n. 7.  We conclude that the record supported the district court's grants of summary judgment, as well as the court's post-trial judgments.

*Weinbaum*, 541 F.3d at 1038.

## IV.    Conclusion.

Wherefore the Defendant, the Concord Community Schools, respectfully requests that the Court deny the Plaintiffs' Request for a Preliminary Injunction.  Moreover, the School also requests that the Court enter judgment in its favor, as under the undisputed facts, it is entitled to judgment as a matter of law, together with all other just and proper relief in the premises.

FROST BROWN TODD LLC

By: */s/Thomas E. Wheeler*
Thomas E. Wheeler, II, #13800-49
Anthony W. Overholt, #16481-49

Attorneys for Defendant

30

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 5th day of November, 2015, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system:

Daniel I. Mach
Heather L. Weaver
American Civil Liberties Union
915 15th Street, NW, 6th Floor
Washington, DC  20005

Ryan D. Jayne
Samuel T. Grover
Freedom From Religion Foundation
10 N. Henry Street
Madison, WI  53701

Gavin M. Rose
ACLU of Indiana
1031 E. Washington Street
Indianapolis, IN  46202

/s/Thomas E. Wheeler
Thomas E. Wheeler, II

FROST BROWN TODD LLC
201 North Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
twheeler@fbtlaw.com

LR00264.0631345   4841-0701-3162v1

31