UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION; JOHN DOE; and JACK DOE, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-CV-463 JD |
| | ) | |
| CONCORD COMMUNITY SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION, ORDER AND
## PRELIMINARY INJUNCTION

This case presents a challenge to the inclusion of a living nativity scene in the annual

holiday show presented at Concord High School, known as the Christmas Spectacular. The event

showcases each of the various aspects of the School's performing arts department, including its

bands, orchestras, choirs, and dance team. Initially modeled after the Radio City Christmas

Spectacular, the show features a variety of musical performances in the holiday theme, many of

which include dancing, choreography, or lighting displays. For its conclusion, though, the show

takes a distinctly religious tone. At least until this year, the final twenty minutes of the show

featured readings from the Bible of the story of the birth of Jesus, accompanied by multiple

musical ensembles playing religious songs aligning with the nativity story, while students

dressed as biblical characters stood on stage against the backdrop of a manger and portrayed a

live nativity scene.

On October 7, 2015, the plaintiffs in this action—a student, his father, and the Freedom

From Religion Foundation—filed suit, alleging that the living nativity scene and biblical

readings violate the Establishment Clause of the First Amendment. They have now filed a

motion for a preliminary injunction, seeking to enjoin the defendant, Concord Community Schools, from including the living nativity scene or the Bible readings in this year's Christmas Spectacular. [DE 13]. In responding to the motion, the School indicates that certain changes have been made to this year's show, including the addition of songs pertaining to Chanukah and Kwanzaa and the removal of any readings from the Bible. The School argues that this program, at least as modified, complies with the Establishment Clause. Given the removal of the Bible readings from the show, only the living nativity scene remains subject to the Plaintiffs' motion. For the reasons discussed below, the Court concludes that, based on the manner in which it is presented and its current context within the show, the living nativity scene impermissibly conveys an endorsement of religion and thus runs afoul of the Establishment Clause. Accordingly, the Court grants the motion for a preliminary injunction.

## I. FACTUAL BACKGROUND[1]

Concord Community Schools is a public school corporation located in Elkhart County, Indiana. It serves approximately 5,300 students from four elementary schools, one intermediate school, one junior high school, and one high school—Concord High School, which has an enrollment of about 1,700 students. Concord High School has a performing arts department that involves approximately half of the students at the school. The department includes a marching band, three different concert bands, two jazz bands, a pep band, a string orchestra, a symphony

---

[1] The Court draws these facts from the exhibits the parties have filed, as the parties have represented to the Court that they do not wish to present any live evidence at an evidentiary hearing. Moreover, hearings on motions for preliminary injunctions are not required where, as here, there are no material disputed facts that require deciding credibility issues. *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 577 (7th Cir. 1999); *Medeco Sec. Locks, Inc. v. Swiderek*, 680 F.2d 37, 38 (7th Cir. 1981). Furthermore, because the parties have thoroughly set forth their respective positions in their written filings, the Court would not benefit from holding oral argument on this motion.

orchestra, and six different performance and show choirs. The department also offers other artistic outlets, with programs in dance, theatre, and stagecraft.

The performing arts department presents a number of programs throughout the school year that allow the students to experience performing in front of live audiences. Those include an annual musical, a variety show, a band festival, a choral pops concert, a jazz café, and a Christmas show, which is at issue here. The Christmas show originated in 1970 after the marching band attended the Radio City Christmas Spectacular during a trip to New York City. Every year since then, the School has presented the Christmas Spectacular, modeled after the Radio City version, as its holiday show. The Christmas Spectacular typically includes performances from two string orchestras, a symphony orchestra, a concert band, two jazz bands, five choirs, and small chamber groups. It also includes dance teams, students from the drama program, and stage technicians, and involves over 600 students in total. The Christmas Spectacular is performed five times each year, including four public performances over a weekend, and a school-day performance for younger students in the district on a Friday.

The Christmas Spectacular generally runs about ninety minutes long, plus a fifteen minute intermission. The first portion of the show runs for about sixty minutes, and includes about twenty songs performed by the various ensembles. In the 2015 show, this portion will include songs such as The Holly and the Ivy; Winter Wonderland; Text Me Merry Christmas; Parade of the Wooden Soldiers; Let it Snow; and White Christmas. Each song is generally performed by a different ensemble than the last, likely with brief pauses in between to arrange the groups on stage, and many of the performances feature visual aspects such as dancing, choreography, or lighting displays. This portion of the show changes each year depending on the musical selections chosen by the directors of each of the various ensembles.

The portion of the show that is contested in this case comes in the second half, after the intermission. For each year since the show's inception, this portion of the show has closed with a segment that runs roughly twenty minutes, and that includes a medley of ten different songs, each listed in the program under the heading "The Story of Christmas." Each of the songs during this medley are religious hymns or carols with a Christian influence, such as Angels We Have Heard on High; O Little Town of Bethlehem; Away in a Manger; and Hark, the Herald Angels Sing. One of the bands, one of the orchestras, and the combined choirs perform during this medley, sometimes individually and sometimes in combination. This segment has begun with an announcement that states: "Ladies and gentlemen: As we now present the Story of Christmas, we ask that you please hold your applause until the conclusion." [DE 36-1]. Thereafter, a faculty narrator, reading from a script, tells the story of the birth of Jesus, reciting portions of the story as it appears in the Bible, at Luke 2:6–14 and Matthew 2:1–11. Beginning with the fifth song, a nativity scene appears on stage, portrayed by student performers dressed in appropriate costumes and standing in a nativity set. Once they take their positions in the nativity scene, the students stand still and remain in that position for the final twelve minutes of the show, until its conclusion.

The School has made two changes to the second half of this year's show as compared to previous shows and apparently in response to the filing of this lawsuit. First, it has decided to omit the narration that included the Bible readings. Second, it has also added songs pertaining to Chanukah and Kwanzaa in the second half of the show. The show will resume after the intermission with one of the string ensembles playing "Ani Ma'amin," in reference to Chanukah, after which one of the choirs will sing "Harambee," in reference to Kwanzaa. No live visual aspects will accompany those performances, but the School plans to project images of the

respective holidays, such as a menorah or dreidel for Chanukah, and candles or a mat for Kwanzaa, onto screens on the side walls of the auditorium. The precise content of those displays has not yet been determined. In addition, the Chanukah, Kwanzaa, and Christmas segments will each be introduced by a student reading a short script noting the cultural significance of the respective holiday. The Chanukah and Kwanzaa segments are likely to last three or four minutes each,[2] while the Christmas segment, as before, will last about twenty minutes, with the nativity scene on stage for the final twelve minutes of that segment.

The Plaintiffs in this case include Jack Doe, a student at Concord High School, and John Doe, his father.[3] Jack Doe participates in the performing arts program, and he performed in the 2014 Christmas Spectacular and will be performing in the 2015 Christmas Spectacular. John Doe attended the 2014 Christmas Spectacular in order to support his son and be involved in his son's activities, and he plans to attend the 2015 Christmas Spectacular, also. The Does are not Christian, and they are offended by the inclusion of a living nativity scene and Bible readings as part of the Christmas Spectacular, which they view as sending a message that Christians are favored by the School while non-Christians such as themselves are outsiders. They filed this suit along with the Freedom From Religion Foundation, which is a not-for-profit organization devoted to the separation of church and state. Prior to filing suit, the Freedom From Religion Foundation sent a letter to the superintendent of Concord Community Schools, asking that the School omit the nativity scene and Bible readings from this year's Christmas Spectacular. The School did not respond directly to the Freedom From Religion Foundation, but the

_____

[2] The post-intermission portion of the show is planned to take thirty minutes, of which about twenty minutes will be the Christmas portion. The remaining ten minutes will include Ani Ma'amin, Harambee, and a third song, One Amazing Night.

[3] The Does filed a motion for leave to proceed by anonymous name, which the magistrate judge granted on November 30, 2015.

superintendent read a statement at a school board meeting in which he indicated that the School did not intend to comply with that request. Accordingly, the Plaintiffs filed this suit, and have now moved for a preliminary injunction. As noted above, the initial motion sought to enjoin the performance of the live nativity scene and the Bible readings. Since the School has since decided not to include the Bible readings as part of the show, the Plaintiffs now ask solely that the living nativity scene be enjoined.

## II.  STANDARD OF REVIEW

To obtain a preliminary injunction, the moving party must demonstrate that (1) it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied; and (2) there is some likelihood of success on the merits of the claim. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). If the moving party meets this threshold burden, the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest. *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012); *Ezell*, 651 F.3d at 694.  This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor. *See Planned Parenthood*, 699 F.3d at 972. The aim is to minimize the costs of a wrong decision. *See Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012).

## III.  DISCUSSION

The Plaintiffs assert that the portrayal of a living nativity scene in the Christmas Spectacular violates the Establishment Clause and should be preliminarily enjoined. The School responded in opposition to that request, and also argued that this case was not ripe when it was filed and that the Plaintiffs may not have standing to prosecute this action. Because those two

arguments present threshold questions as to the justiciability of this matter, the Court addresses

them first, and then turns to whether a preliminary injunction is justified.

A.      Ripeness

The School first argues that this action was not ripe when it was filed because the School

had not yet finalized the content of the show at that time. "Ripeness doctrine is based on the

Constitution's case-or-controversy requirements as well as discretionary prudential

considerations." *Wisc. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148

(7th Cir. 2011). "A claim is not ripe for adjudication if it rests upon 'contingent future events that

may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S.

296, 300 (1998). In arguing that this case was not ripe as to the 2015 show when it was filed, the

School relies heavily on *Staley v. Harris Cty., Tex.*, 485 F.3d 305 (5th Cir. 2007), in which the

Fifth Circuit addressed a challenge to the public display of a monument containing a Bible on the

grounds of a county courthouse. Just prior to oral argument, the county removed the monument

and placed it in storage to permit the ongoing renovation of the courthouse and its grounds. *Id.* at

307. The court dismissed the case because the removal of the monument rendered the case moot.

*Id.* The court further held that any challenge to the monument should it be restored would be

unripe, since it was unclear when, where, or under what circumstance the monument might be

restored. *Id.* at 309 ("[A]ny dispute over a probable redisplay of the Mosher monument is not

ripe because there are no facts before us to determine whether such a redisplay might violate the

Establishment Clause. Indeed, no decision has been made regarding any aspect of the future

display. In the absence of this evidence, we are unable to conduct the fact-intensive and context-

specific analysis required . . . .").

Those uncertainties are not present in this case, though. The School has presented the

Christmas Spectacular in substantially the same form, at least as far as the living nativity portion

is concerned, for at least the last twenty-seven years, and possibly the last forty-five years. [DE 35-1 p. 14–16]. There was no question that the Christmas Spectacular was going to be presented again in December 2015, as rehearsals for it had already began when this suit was filed. [DE 13-3]. In addition, prior to filing suit, the Freedom From Religion Foundation sent a letter to the School noting its concerns about the nativity scene and requesting that the School modify the show to omit that portion. [DE 13-4 p. 6–7]. In response, the School's superintendent read a statement at a school board meeting that indicated (though in not so many words, and with distinctly lawyerly evasiveness) that the School would not comply with the request. [DE 13-2 p. 16]. Moreover, plans for the Christmas Spectacular have now been finalized for the most part, so the Court need not speculate as to whether the event will occur or in what form, and can assess the merits of the case based on the content of the show as it is actually set to occur. Therefore, the Court rejects the School's argument that the Court lacks jurisdiction over this action because it is unripe.

**B.     Standing**

Next, in arguing that the Plaintiffs will not suffer irreparable injury as required for a preliminary injunction, the School also argued that the Plaintiffs may not suffer an injury in fact, and thus may not even have standing. Though the School raised the issue only obliquely, the Court will address it on its substance since courts have an obligation to ensure their jurisdiction. In the Seventh Circuit, a party has standing to raise an Establishment Clause challenge if they "must come into direct and unwelcome contact with the religious display to participate fully as a citizen and to fulfill legal obligations." *Books v. Elkhart Cty., Ind.* (*Books II*), 401 F.3d 857, 861 (7th Cir. 2005). Here, Jack Doe performed in the 2014 show and will be performing in the 2015 show, so he has and will come into direct and unwelcome contact with the nativity display in order to participate fully in his activities as a student. [DE 13-3]. Likewise, John Doe attended

the 2014 show in support of his son, and will attend the 2015 show, and thus has also come into direct and unwelcome contact with that display in his role as a parent. [DE 13-2]. That suffices to establish standing. *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 507 (7th Cir. 2010) (holding that a student at a public school who was exposed to a practice that allegedly violated the Establishment Clause had standing to challenge that practice); *Croft v. Governor of Texas*, 562 F.3d 735, 746 (5th Cir. 2009) (likewise as to parents); *see also Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 225 n.9 (1963) ("The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain.").

## C.     Preliminary Injunction

The Plaintiffs' request for a preliminary injunction pertains specifically to the inclusion of the living nativity scene as part of the Christmas Spectacular. The Court begins its analysis as to the request for a preliminary injunction by considering the Plaintiffs' likelihood of success on the merits, which is the focus of the parties' arguments in this matter. Finding that the Plaintiffs have established a sufficient likelihood of success on the merits, the Court then considers the equitable factors and balances the competing harms, and concludes that a preliminary injunction is warranted.

### 1.     Likelihood of Success on the Merits

The Plaintiffs argue that the living nativity scene violates the Establishment Clause of the First Amendment, which states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend I, cl. 1. This clause was made applicable to the actions of state and municipal governments by the Fourteenth Amendment. *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 849 (7th Cir. 2012). "[T]he touchstone for Establishment Clause challenges remains 'the principle that the First Amendment mandates government neutrality between

religion and religion, and between religion and nonreligion.'" *Id.* (quoting *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005)). As discussed by the en banc Seventh Circuit in *Elmbrook*, "[t]he three-pronged test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), 'remains the prevailing analytical tool for the analysis of Establishment Clause claims.'" *Id.* (quoting *Books v. City of Elkhart* (*Books I*), 235 F.3d 292, 301 (7th Cir. 2000)); *see also Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 507 (7th Cir. 2010). Under the *Lemon* test, "a government practice violates the Establishment Clause if it (1) lacks a legitimate secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive entanglement with religion." *Id.* (citing *Lemon*, 403 U.S. at 612–13).

The Supreme Court has also advanced two other approaches by which an Establishment Clause violation can be detected. *Id.* First, in what may simply be an alternate way of framing the second *Lemon* prong, a governmental practice violates the Establishment Clause if it has "'the effect of communicating a message of government endorsement or disapproval of religion.'" *Id.* (quoting *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring)); *see also Cty. of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 592–93 (1989). Under that test, a court must "'assess the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion.'" *Elmbrook*, 687 F.3d at 850 (quoting *Books I*, 235 F.3d at 304). Second, a governmental practice violates the Establishment Clause if it "applie[s] coercive pressure on an individual to support or participate in religion." *Id.*; *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000); *Lee v. Weisman*, 505 U.S. 577 (1992). Though it is not clear whether or where this test belongs in the *Lemon* test, "it is evident that if the state 'coerce[s] anyone to

support or participate in religion or its exercise,' an Establishment Clause violation has occurred." *Elmbrook*, 687 F.3d at 850 (quoting *Lee*, 505 U.S. at 587) (alteration in original).

In challenging the living nativity scene, Plaintiffs argue that it is coercive, that it endorses Christianity or has the primary effect of advancing religion, and that it lacks a secular purpose. The Court believes that the endorsement test is most applicable here, and because the proposed portrayal of the nativity scene does not pass that test under these particular circumstances, the Court need not address the other tests.[4] "[T]he prohibition against governmental endorsement of religion 'precludes government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred.'" *Allegheny*, 492 U.S. at 593 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring)) (alteration and emphasis omitted). The endorsement test "'asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" *Books II*, 401 F.3d at 867 (quoting *Freedom from Religion Found., Inc. v. City of Marshfield, Wisc.*, 203 F.3d 487, 493 (7th Cir. 2000)). In applying this test, courts "evaluate the effect of the challenged government action by 'assessing the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion.'" *Id.* (quoting *Books I*, 235 F.3d at 304). More specifically, courts ask "whether an objective, reasonable observer, 'aware of the history and context of the community

---

[4] The Court notes that the School argues that Jack Doe can opt out of the objected-to portion of the Christmas Spectacular. Because the School raises that argument only in the context of the coercion test, which the Court does not reach, the Court need not separately address that argument. Even assuming that Jack Doe is fully able to opt out, though, that fact would not impact the analysis. *Santa Fe*, 530 U.S. at 312 (holding that pregame prayer at high school football games would be coercive even if any student's attendance at the games was "purely voluntary"); *Elmbrook*, 687 F.3d at 856 (holding that choosing whether to attend an event to avoid coercion is "a choice . . . the Establishment Clause does not force students to make").

and forum in which the religious display appears,' would fairly understand the display to be a government endorsement of religion." *Id.* (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring)). In addition, "the case law has evinced special concern with the receptivity of schoolchildren to endorsed religious messages," and has "long guarded against government conduct that has the effect of promoting religious teachings in school setting." *Elmbrook*, 687 F.3d at 851.

At the outset, the Court notes that the School relies primarily on cases addressing passive displays containing religious symbols, where the courts evaluate the effect of the religious aspects of the display in light of their context in the display as a whole. The School thus argues that, when viewed in the context of the Christmas Spectacular as a whole, the living nativity scene would not convey an endorsement of religion. In response, the Plaintiffs argue in part that cases involving passive displays are wholly inapplicable to this case, which involves a live performance. It reasons that "when the government promotes religion at one isolated point in time, through a performance or direct speech, it has violated the Establishment Clause regardless of what speech it may give at other points in time." [DE 35 p. 17]. That is true enough, but the point is that whether the government is actually endorsing religion at that isolated point in time has to be determined based on the totality of the circumstances of the performance or speech. *Lynch*, 465 U.S. at 680 ("Focus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause."). For example, though daily Bible readings are impermissible when mandated for their own sake, even if the vast majority of instructional time is spent on secular topics, the Supreme Court has repeatedly acknowledged that study and reading of the Bible can be required "as part of a secular program of education." *Abington*, 374 U.S. at 223–25; *see also Stone v. Graham*, 449 U.S. 39, 42 (1980) ("[T]he Bible

may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.").

There is no reason such instruction has to be confined to book learning, either, and the bright line the Plaintiffs attempt to draw between observation and performance is untenable. For example, there is little question that a choir can not only study but sing sacred music. *Bauchman ex rel. Bauchman v. W. High Sch.*, 132 F.3d 542, 554–55 (10th Cir. 1997) ("[I]t is recognized that a significant percentage of serious choral music is based on religious themes or test. Any choral curriculum designed to expose students to the full array of vocal music culture therefore can be expected to reflect a significant number of religious songs."); *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 407–08 (5th Cir. 1995). Even though singing sacred music may be a religious exercise for adherents to that religion, performing such music in public schools is acceptable when it is an appropriate part of the study of choral music; a reasonable observer would be able to perceive the religious songs as part of the context of the performance as a whole. *Bauchman*, 132 F.3d at 555.

As the Eighth Circuit explained in *Florey*, discussing the applicability of this analysis to performances with religious content in schools:

> [T]he study of religion is not forbidden "when presented objectively as part of a secular program of education." *Abington School Dist. v. Schempp*, *supra*, 374 U.S. at 225, 83 S. Ct. at 1573. We view the term "study" to include more than mere classroom instruction; public performance may be a legitimate part of secular study. This does not mean, of course, that religious ceremonies can be performed in the public schools under the guise of "study." It does mean, however, that when the primary purpose served by a given school activity is secular, that activity is not made unconstitutional by the inclusion of some religious content.

*Florey v. Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1315–16 (8th Cir. 1980). Likewise, as the Ninth Circuit noted in *Brown*, "having children act out a ceremonial American Indian dance for the purpose of exploring and learning about American Indian culture may be permissible even if

the dance was religious ritual. Similarly, a reenactment of the Last Supper or a Passover dinner might be permissible if presented for historical or cultural purposes." *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1380 n.6 (9th Cir. 1994). In these cases, as in all Establishment Clause cases, *McCreary*, 545 U.S. at 867 ("[U]nder the Establishment Clause detail is key."); *Lynch*, 465 U.S. at 694 (O'Connor, J., concurring) ("Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement of religion."), their resolution is intensely fact-specific and is not controlled by whether the students observed or participated in the activity. Therefore, the Court disagrees with the Plaintiffs that the nativity scene in question necessarily endorses religion because it is performed instead of merely observed and that the Court need not consider the context in which that performance takes place. *Doe v. Wilson Cty. Sch. Sys.*, 564 F. Supp. 2d 766, 800 (M.D. Tenn. 2008) (evaluating and upholding a live nativity scene as part of a school holiday program in light of all of the circumstances of the performance).

Accordingly, the Court must proceed to consider whether this particular performance of the live nativity scene, in light of all of the pertinent context and circumstances, would convey a message of endorsement of religion to a reasonable observer. On that issue, the Court agrees with the Plaintiffs. In defending the nativity scene, the School argues primarily that the nativity is on stage for twelve minutes out of the ninety-minute show, or for about thirteen percent of the show. Looking only at the percentages, that fact would tend to favor the School. However, it is also important to consider the manner in which a religious performance is presented in relation to the other aspects of a show to assess what message it conveys. *Books II*, 401 F.3d at 868 (approving of a display including the Ten Commandments in part because they were portrayed in an identical fashion to the eight other documents and symbols in the display); *Ind. Civil Liberties*

*Union v. O'Bannon*, 259 F.3d 766, 773 (7th Cir. 2001) (considering the size of the text of the Ten Commandments in relation to other displays and the relative placement of the displays in considering whether they amounted to endorsement of religion); *see Allegheny*, 492 U.S. at 598 (noting that "the effect of a crèche turns on its setting").

Here, the nativity scene is emphasized in a manner unlike any other aspect of the show. To begin with, the nativity scene is on stage continuously for twelve minutes. While that is not a large percentage of the show as a whole, no other performance lasts that long, or even nearly so. For example, the wooden soldiers (whose song will be part of the 2015 show) were on stage for just over two minutes as part of their respective number in the 2014 show. Further, the nativity scene provides the visual centerpiece for an uninterrupted medley of performances that includes ten different songs and that lasts about twenty minutes.[5] By comparison, the rest of the performances during the show last around three minutes each—the first half of the show is scheduled to last one hour, and includes nineteen separate performances. That twenty-minute segment is nearly a quarter of the show, and dominates the show following the intermission.

Moreover, each of the songs during that sequence are religious songs that generally align with the story of the birth of Jesus, which further serves to reinforce the religious message that the nativity scene itself conveys. *Allegheny*, 492 U.S. at 599 ("[B]ecause some of the carols performed at the site of the crèche were religious in nature, those carols were more likely to augment the religious quality of the scene than to secularize it."). The nativity portion of the show also features multiple of the School's musical ensembles, including a band, an orchestra, and multiple choral ensembles, all of which perform together for the final two numbers. In

---

[5] At least during the 2014 show, the audience was asked to hold its applause until the end of this segment.

addition, while the majority of the performances during the show convey a joyfulness and exuberance characteristic of the holiday season, the nativity portion of the show has a distinctly different character. It conveys solemnity and reverence, as if the audience is being asked to venerate the nativity, not simply acknowledge or appreciate its place in the winter holiday season.

Furthermore, a reasonable observer would interpret the message being conveyed by the nativity scene in light of its connection to the educational purposes it may appear to serve. *Bauchman*, 132 F.3d at 555; *see generally Allegheny*, 492 U.S. at 635 (noting that viewers' understanding of the purpose of the display may affect whether they perceive a message of endorsement). In that respect, while other performances include visual effects such as choreography or dancing, which have a clear connection to the performance aspect of the show, the nativity scene primarily features students standing still on stage. The students portraying the nativity scene are not singing, playing instruments, dancing, or otherwise practicing the skills that are typically thought of as part of a performing arts department.[6] While there is still some performance aspect to the nativity scene, a reasonable observer could perceive that the nativity scene is actually on stage for the religious message it conveys instead of as an outlet for the performing talents of the students or for the pedagogical value of its performance. Moreover, the use of student performers to depict this distinctly religious scene further increases the likelihood that it will be seen as an endorsement of religion. *Brown*, 27 F.3d at 1380 (noting that "active participation in 'ritual' poses a greater risk of violating the Establishment Clause than does merely reading, discussing or thinking about religious texts"); *see also Elmbrook*, 687 F.3d at

---

[6] In fact, the School selects the performers merely by soliciting volunteers from ensembles that do not happen to be performing during that segment of the show. [DE 35-1 p. 16–18].

851 (noting that "the case law has evinced special concern with the receptivity of schoolchildren to endorsed religious messages"). While that factor is not dispositive, as discussed above, it still informs the context and circumstances of the display from which an observer would interpret its meaning.

The sequential nature of a live show may also give it a greater tendency to convey a message of endorsement, compared to a display where all of the images appear simultaneously. While a reasonable observer would perceive each song in the context of the rest of the show, each individual performance is the sole focus of attention for the time it is on stage, whereas in stationary displays of multiple images an observer's attention might not be drawn specifically to any one image. *See Books II*, 401 F.3d at 868 (approving of a display containing the Ten Commandments in part because it was placed among other documents "in a way that does not direct an observer to focus on any one document"); *O'Bannon*, 259 F.3d at 773 (disapproving of a display of the Ten Commandments in part because the other, secular text appeared on the opposite side of the same slab, which "inhibits observers from visually connecting the texts"). Here, the nativity scene is on stage for twelve minutes and serves as the visual focal point of the show during that time, which increases the likelihood that it could be seen as conveying a message of endorsement even in light of the other secular performances during the show.

The School also emphasizes that since the filing of the lawsuit it has added songs relating to Chanukah and Kwanzaa to this year's show, and will read a brief introduction for each of those songs and for the Christmas medley explaining their context in the holiday season. By incorporating a religious holiday and a cultural holiday other than Christmas, this addition may somewhat diminish the appearance that the Christmas portion of the show is endorsing Christianity rather than acknowledging the various winter holidays. *Allegheny*, 492 U.S. at 635

(O'Connor, J., concurring) (stating that by including a religious symbol of Chanukah and a secular symbol of Christmas, along with a sign saluting liberty, the display conveyed a message of celebrating pluralism instead of endorsing religion). However, the way in which Chanukah and Kwanzaa are being presented in the show in comparison to the Christmas portion in general and the nativity scene in particular actually serves to place greater emphasis on and suggest greater preference of the religious message conveyed by the nativity scene. The Chanukah and Kwanzaa portions will each include a single song performed by a single ensemble, and will last about three or four minutes each. In addition, those portions will not include any live visual components, but may have images representing those holidays projected onto a screen. Meanwhile, the nativity scene is on stage for twelve minutes—more than the other holiday performances combined—and the Christmas portion as a whole lasts about twenty minutes, includes ten different religious songs, and is performed by multiple ensembles from a cross-section of the performing arts department. The nativity scene also includes students on stage in costumes, with props, standing in a set and portraying the definitive religious symbol of the Christmas holiday, whereas the other holidays will have images projected onto a screen. The disparity is striking. That is not to say that a show must give equal time to respective holidays or religions in order to comply with the Establishment Clause. However, when the School places such disproportionate emphasis in each of those respects on the Christmas holiday, and in particular the religious aspect of that holiday through the live depiction of the nativity scene, it adds to the perception that the School is actually endorsing that religion.

In addition, a reasonable observer is presumed to be aware of the history of an event, too, which further supports the Plaintiffs' position and diminishes the effect of the changes to this year's show. *McCreary*, 545 U.S. at 866 ("[R]easonable observers have reasonable memories,

and our precedents sensibly forbid an observer 'to turn a blind eye to the context in which [the] policy arose.'" (quoting *Santa Fe*, 530 U.S. at 315)); *Books II*, 401 F.3d at 867 (noting that the reasonable observer is "aware of the history and context of the community and forum in which the religious display appears"). For at least the last twenty-seven years, and likely the last forty-five, the School has performed the living nativity scene as part of its Christmas Spectacular. The fact that this segment has remained constant while the other portions have changed or rotated could itself suggest a preference for that segment and its message. In addition, until this year, every show has included a narration by a faculty member that includes readings from the Bible of the story of Jesus's birth. Particularly given the context described above, the religious and Christian message conveyed by those performances with both the live nativity scene and the Biblical narration is unmistakable. A reasonable observer of this year's show would recall that history, and since only the Bible reading has been removed from the Christmas portion of the show, the observer would likely perceive the show as conveying the same message through the nativity scene, though slightly less overtly. This factor weighs in favor of finding an endorsement of religion here, too.

In sum, the Court concludes that in light of all of those factors, a reasonable observer would fairly believe that the portrayal of the living nativity scene, when viewed in the particular context, circumstances, and history of the Christmas Spectacular, conveys a message of endorsement of religion, or that a particular religious belief is favored or preferred. Accordingly, the Court finds that the Plaintiffs are likely to succeed on the merits on their claim that the inclusion of the living nativity scene in the show, as currently proposed, violates the Establishment Clause.

## 2. Irreparable Harm and Balancing of the Equities

Once a movant establishes a likelihood of success on the merits, they must also demonstrate that, absent an injunction, they would suffer irreparable harm for which traditional legal remedies would be inadequate. The Court must then balance the competing harms to the parties in order to minimize the cost of potential error, and consider the public interest. Here, as to irreparable harm for which legal remedies are inadequate, courts have repeatedly recognized that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate . . . ."); *H.S. v. Huntington Cty. Cmty. Sch. Corp.*, 616 F. Supp. 2d 863, 879 (N.D. Ind. 2009) (same, in the Establishment Clause context); *Ind. Civil Liberties Union Inc. v. O'Bannon*, 110 F. Supp. 2d 842, 858 (S.D. Ind. 2000), *aff'd*, 259 F.3d 766 (2001) (same). In arguing to the contrary, the School argues only that the Plaintiffs have failed to show an Establishment Clause violation, so they have failed to show any cognizable injury. For the reasons discussed above, the Court disagrees, and since the Does will participate in and observe the show and come into direct contact with the improper endorsement of religion, the Court finds that the Plaintiffs have satisfied this element.

The Court must next balance the respective harms that would be avoided or caused by the issuance of an injunction, along with the public interest. The only harm that the School identifies is that the motion for a preliminary injunction is an "invitation to this Court to essentially run the School's performing arts program." [DE 26, p. 33]. That argument vastly overstates the scope of the motion or of this order, though. The Plaintiffs have challenged a single aspect of a single show. Granting the motion would not cause the Court to become entangled in the operation of

the School's performing arts program, and would not entail any continuing oversight of or input into its operations or curriculum, save for potentially enforcing the discrete injunction that has been requested. Though the School may naturally recoil at having its performances subjected to judicial scrutiny, it does not suffer a cognizable injury by being ordered to comply with the Establishment Clause.

The Court also acknowledges that if an injunction on relatively short notice were to upset a substantial portion of the show, it could interfere with the students' ability to participate in and derive educational benefits from the show. However, the injunction requested is narrow, and only pertains to the visual aspect of one portion of the show that can likely be excised quite easily. In addition, as also noted above, the nativity scene itself seems to have only an ancillary relation to the educational goals served by the performance and involves relatively few students, so enjoining its inclusion in the show will not cause substantial harm to the students. Last, "injunctions protecting First Amendment freedoms are always in the public interest," *Walker*, 453 F.3d at 859, so that factor weighs in favor of an injunction, too. Balancing the respective harms, the Court finds that the harm that would result from declining to enjoin an activity that is likely to violate the Establishment Clause outweighs the harm that would result from entering such an injunction, so a preliminary injunction is warranted.

The Court must therefore determine the appropriate scope of the injunction. As discussed above, it is not per se impermissible to portray a live nativity scene with student performers, so long as the totality of the circumstances of such a performance do not convey an endorsement of religion. The injunction that the Plaintiffs request against any portrayal of the living nativity scene during the show is thus somewhat overbroad. However, the School has not suggested any middle ground. Further, it would be near impossible to craft a preliminary injunction that

complies with Rule 65(d)(1)'s specificity requirement by defining each of the circumstances that combine to make this particular living nativity scene impermissible and instructing the School not to perform the show in that manner, while at the same time not crafting the injunction so narrowly that the School could make a minor alteration and comply with the injunction while still violating the Establishment Clause. *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010) ("[T]he injunction must also be broad enough to be effective, and the appropriate scope of the injunction is left to the district court's sound discretion."); *see also McCreary*, 545 U.S. at 874 ("[D]istrict courts are fully capable of adjusting preliminary relief to take account of genuine changes in constitutionally significant conditions."). Thus, to the extent the requested injunction is slightly overbroad, it is necessarily so, and the Court will grant Plaintiffs' request to enjoin any portrayal of the nativity scene through the use of live performers during the 2015 Christmas Spectacular.

The Plaintiffs also request that the preliminary injunction be issued without a bond, which is typically required under Rule 65(c) (permitting the issuance of a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained"); *Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011) ("Normally an injunction bond or equivalent security is essential."). The School did not respond to that request, nor has it suggested that it would suffer any costs or damages by having to modify the show as directed in this order. Accordingly, the Court will not require the Plaintiffs to post a bond for this injunction to take effect.

Finally, the Court notes that the School requested in its response brief that the Court enter judgment in its favor on the merits of the complaint. That request was premature regardless of

the resolution of this motion, but having resolved the motion in the Plaintiffs' favor, the Court

denies that request.

## IV.  CONCLUSION

The Court GRANTS the Plaintiffs' motion for a preliminary injunction [DE 13]. The

Court ORDERS that Concord Community Schools is ENJOINED from organizing, rehearsing,

presenting, or intentionally allowing to be presented, any portrayal of a nativity scene that is

composed of live performers as part of its 2015 Christmas Spectacular shows. The Plaintiffs

shall not be required to post any bond for this injunction to take effect.

SO ORDERED.

ENTERED:  December 2, 2015


_____/s/ JON E. DEGUILIO_____
Judge
United States District Court