APPEAL,BRIGHT–LN,PROTO,TERMED

# U.S. District Court Northern District of Indiana [LIVE]
# USDC Northern Indiana (South Bend)
# CIVIL DOCKET FOR CASE #: 3:15–cv–00463–JD

| | |
|---|---|
| Freedom From Religion Foundation et al v. Concord Community Schools | Date Filed: 10/07/2015 |
| | Date Terminated: 03/06/2017 |
| Assigned to: Judge Jon E DeGuilio | Jury Demand: None |
| Cause: 42:1983 Civil Rights Act | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Freedom From Religion Foundation**　　　　represented by　**Daniel I Mach PHV**
American Civil Liberties Union – Was/DC
915 15th St NW 6th Fl
Washington, DC 20005
202–675–2330
Fax: 202–546–0738
Email: dmach@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gavin M Rose**
ACLU of Indiana
1031 E Washington St
Indianapolis, IN 46202
317–635–4059 Ext 106
Fax: 317–635–4105
Email: grose@aclu–in.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heather L Weaver PHV**
American Civil Liberties Union – Was/DC
915 15th St NW 6th Fl
Washington, DC 20005
202–675–2330
Fax: 202–546–0738
Email: hweaver@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ryan D Jayne PHV**
Freedom From Religion Foundation
10 N Henry St
Madison, WI 53701
608–256–8900
Email: ryan@ffrf.org

1

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel T Grover PHV**
Freedom From Religion Foundation
10 N Henry St
Madison, WI 53701
608–256–8900
Email: sgrover@ffrf.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| John Doe | represented by | **Daniel I Mach PHV** |
|---|---|---|

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gavin M Rose**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heather L Weaver PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel T Grover PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| Jack Doe | represented by | **Daniel I Mach PHV** |
|---|---|---|

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gavin M Rose**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heather L Weaver PHV**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samuel T Grover PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Roe**                               represented by   **Gavin M Rose**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Noe**                               represented by   **Gavin M Rose**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Concord Community Schools**              represented by   **Timothy S Shelly**
                                                            Warrick and Boyn LLP
                                                            NBD Bank Building
                                                            121 W FranklinSt Ste 400
                                                            Elkhart, IN 46516–3284
                                                            574–294–7491
                                                            Fax: 574–294–7284
                                                            Email: tshelly@warrickandboyn.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Anthony W Overholt**
                                                            Frost Brown Todd LLC – Ind/IN
                                                            201 N Illinois St Ste 1900
                                                            PO Box 44961
                                                            Indianapolis, IN 46204–4236
                                                            317–237–3800
                                                            Fax: 317–237–3900
                                                            Email: aoverholt@fbtlaw.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Thomas E Wheeler , II**
                                                            Frost Brown Todd LLC – Ind/IN
                                                            201 N Illinois St Ste 1900
                                                            PO Box 44961
                                                            Indianapolis, IN 46244–0961

3

317–237–3800
Fax: 317–237–3900
Email: twheeler@fbtlaw.com
*TERMINATED: 01/16/2017*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 10/07/2015 | 1 | | COMPLAINT *for Declaratory and Injunctive Relief and Nominal Damages* against Concord Community Schools( Filing fee $ 400 receipt number 0755–2766954.), filed by FREEDOM FROM RELIGION FOUNDATION, JACK DOE, JOHN DOE. (Attachments: # 1 Exhibit 1 (FFRF letter), # 2 Exhibit 2 (Superintendent statement), # 3 Civil Cover Sheet, # 4 Proposed Summons)(Rose, Gavin) (Entered: 10/07/2015) |
| 10/07/2015 | 2 | | NOTICE of Appearance by Gavin M Rose on behalf of All Plaintiffs (Rose, Gavin) (Entered: 10/07/2015) |
| 10/07/2015 | 3 | | Corporate Disclosure Statement by FREEDOM FROM RELIGION FOUNDATION. (Rose, Gavin) (Entered: 10/07/2015) |
| 10/07/2015 | 4 | | MOTION Proceed by Anonymous Name and for Protective Order by Plaintiffs JACK DOE, JOHN DOE, FREEDOM FROM RELIGION FOUNDATION. (Attachments: # 1 Exhibit 1 (Does Affidavit), # 2 Exhibit 2 (Law Review Article))(Rose, Gavin) (Entered: 10/07/2015) |
| 10/07/2015 | 5 | | MEMORANDUM in Support of 4 MOTION Proceed by Anonymous Name and for Protective Order filed by JACK DOE, JOHN DOE, FREEDOM FROM RELIGION FOUNDATION. (Rose, Gavin) (Entered: 10/07/2015) |
| 10/07/2015 | | | Judge Jon E DeGuilio and Magistrate Judge Christopher A Nuechterlein added. (NEW CASE WITH PENDING MOTION) (mlc) (Entered: 10/07/2015) |
| 10/07/2015 | 6 | | Summons Issued as to Concord Community Schools. **NOTE:The attached document is accessible by court personnel only. Summons forms that were electronically submitted to the court for issuance will be returned to counsel via e–mail.** (mlc) (Entered: 10/07/2015) |
| 10/07/2015 | 7 | | Application for Attorney Daniel I Mach to Appear Pro Hac Vice on behalf of Freedom From Religion Foundation, John Doe, Jack Doe. Pro Hac Vice fee of $ 93 has been received, receipt number 0755–2767487(Pro Hac Vice Temporary login, ) (Entered: 10/07/2015) |
| 10/07/2015 | 8 | | Application for Attorney Heather L. Weaver to Appear Pro Hac Vice on behalf of Freedom From Religion Foundation, John Doe, Jack Doe. Pro Hac Vice fee of $ 93 has been received, receipt number 0755–2767507(Pro Hac Vice Temporary login, ) (Entered: 10/07/2015) |
| 10/13/2015 | 9 | | ORDER granting 7 Application to Appear Pro Hac Vice of Attorney Daniel I Mach PHV for JACK DOE, JOHN DOE, and Freedon From Religion Foundation. Signed by Magistrate Judge Christopher A Nuechterlein on 10/13/2015. (mtr) (Entered: 10/13/2015) |
| 10/13/2015 | 10 | | ORDER granting 8 Application to Appear Pro Hac Vice of Attorney Heather L Weaver PHV for JACK DOE, JOHN DOE, and Freedon From Religion Foundation. Signed by Magistrate Judge Christopher A Nuechterlein on |

4

| | | | |
|---|---|---|---|
| | | | 10/13/2015. (mtr) (Entered: 10/13/2015) |
| 10/19/2015 | 11 | | NOTICE of Appearance by Thomas E Wheeler, II on behalf of Concord Community Schools (Wheeler, Thomas) (Entered: 10/19/2015) |
| 10/21/2015 | 12 | | Application for Attorney Samuel T Grover to Appear Pro Hac Vice on behalf of FFRF, Doe family. Pro Hac Vice fee of $ 93 has been received, receipt number 0755–2778933(Pro Hac Vice Temporary login, ) (Entered: 10/21/2015) |
| 10/22/2015 | 13 | | **MOTION for Preliminary Injunction**  by Plaintiffs Jack Doe, John Doe, Freedom From Religion Foundation. (Attachments: # 1 Exhibit 1 (Video of 2014 Christmas Spectacular) (Filed Manually), # 2 Exhibit 2 (Aff. of John Doe), # 3 Exhibit 3 (Aff. of Jack Doe), # 4 Exhibit 4 (Aff. of Annie Laurie Gaylor))(Rose, Gavin) (Entered: 10/22/2015) |
| 10/22/2015 | 14 | | NOTICE OF MANUAL FILING of CD of 2014 Christmas Spectacular by Jack Doe, John Doe, Freedom From Religion Foundation (Rose, Gavin) (Entered: 10/22/2015) |
| 10/22/2015 | 15 | | ***FILED IN ERROR REFILED AT DE 18 *** MEMORANDUM in Support of 13 **MOTION for Preliminary Injunction** filed by Jack Doe, John Doe, Freedom From Religion Foundation. (Rose, Gavin) Modified on 10/22/2015 (rmc). (Entered: 10/22/2015) |
| 10/22/2015 | 16 | | ORDER granting 12 Application to Appear Pro Hac Vice of Attorney Samuel T Grover PHV for Jack Doe, John Doe, and Freedom From Religion Foundation. Signed by Magistrate Judge Christopher A Nuechterlein on 10/22/2015. (mtr) (Entered: 10/22/2015) |
| 10/22/2015 | 17 | | ORDER regarding 13 **MOTION for Preliminary Injunction** . The response brief is due by 11/5/2015 and the reply brief is due by 11/12/2015. This is a text–only order by Judge Jon E DeGuilio on 10/22/2015. (saj) (Entered: 10/22/2015) |
| 10/22/2015 | 18 | | AMENDED MEMORANDUM in Support of 13 **MOTION for Preliminary Injunction**  *(Amended)* filed by Jack Doe, John Doe, Freedom From Religion Foundation. (Rose, Gavin) Modified on 10/22/2015 (rmc). (Entered: 10/22/2015) |
| 10/23/2015 | 19 | | SUMMONS Returned Executed by Freedom From Religion Foundation, Jack Doe, John Doe. Concord Community Schools served on 10/13/2015, answer due 11/3/2015. (Rose, Gavin) (Entered: 10/23/2015) |
| 10/23/2015 | 20 | | RECEIPT from Freedom From Religion Foundation of 2 CDs – see 14 Notice of Manual Filing. (jld) (Entered: 10/23/2015) |
| 10/23/2015 | 21 | | Application for Attorney Ryan D. Jayne to Appear Pro Hac Vice on behalf of Freedom From Religion Foundation. Pro Hac Vice fee of $ 93 has been received, receipt number 0755–2781289(Pro Hac Vice Temporary login, ) (Entered: 10/23/2015) |
| 10/26/2015 | 22 | | ORDER granting 21 Application to Appear Pro Hac Vice of Attorney Ryan D Jayne PHV for Freedom From Religion Foundation. Signed by Magistrate Judge Christopher A Nuechterlein on 10/26/2015. (mtr) (Entered: 10/26/2015) |
| 11/03/2015 | 23 | | |

| | | |
|---|---|---|
| | | ORDER re 4 MOTION Proceed by Anonymous Name and for Protective Order. Court EXTENDS the deadlines for briefing Plaintiffs pending motion to proceed anonymously. Defendants response brief is due no later than November 19, 2015. Plaintiffs reply brief is due no later than November 26, 2015. Signed by Magistrate Judge Christopher A Nuechterlein on 11/3/15. (mc) (Entered: 11/03/2015) |
| 11/04/2015 | 24 | NOTICE of Appearance by Anthony W Overholt on behalf of Concord Community Schools (Overholt, Anthony) (Entered: 11/04/2015) |
| 11/05/2015 | 25 | MOTION for Leave to File Excess Pages *Defendant's Memorandum in Opposition to Plaintiffs' Request for a Preliminary Injunction* by Defendant Concord Community Schools. (Wheeler, Thomas) (Entered: 11/05/2015) |
| 11/05/2015 | 26 | RESPONSE to Motion re 13 **MOTION for Preliminary Injunction** filed by Concord Community Schools. (Wheeler, Thomas) (Entered: 11/05/2015) |
| 11/05/2015 | 27 | AFFIDAVIT in Opposition re 13 **MOTION for Preliminary Injunction** *Affidavit of Scott Spradling* filed by Concord Community Schools. (Attachments: # 1 Exhibit A – Policy 2240, # 2 Exhibit B Concord Performing Arts Department Course Catalog, # 3 Exhibit C1 – Footloose Program, # 4 Exhibit C2 – 2015 Carnival Variety Show Program, # 5 Exhibit C–3 2015 All School Band Festival Program, # 6 Exhibit C4 – 45th Annual Choral Music Pops Concert Program, # 7 Exhibit C5 – 2015 Jazz Cafe Program, # 8 Exhibit C6 2014 Christmas Spectacular Program, # 9 Exhibit D Draft 2015 Christmas Spectacular Program)(Wheeler, Thomas) (Entered: 11/05/2015) |
| 11/06/2015 | 28 | ANSWER to 1 Complaint, by Concord Community Schools.(Wheeler, Thomas) (Entered: 11/06/2015) |
| 11/06/2015 | 29 | ORDER – Plaintiffs' counsel having no objection, the 25 Motion for Leave to File Excess Pages is GRANTED. This is a text–only order by Judge Jon E DeGuilio on 11/6/2015. (saj) (Entered: 11/06/2015) |
| 11/08/2015 | 30 | Consent MOTION for Extension of Time to File Response/Reply as to 26 Response to Motion *for Preliminary Injunction* by Plaintiffs Jack Doe, John Doe, Freedom From Religion Foundation. (Rose, Gavin) (Entered: 11/08/2015) |
| 11/09/2015 | 31 | ORDER granting 30 Motion for Extension of Time to File Response/Reply; Plaintiffs to file reply in support of Motion for Preliminary Injunction by 11/16/2015. This is a text–only order by Judge Jon E DeGuilio on 11/9/2015. (dk) (Entered: 11/09/2015) |
| 11/10/2015 | 32 | NOTICE of Appearance by Timothy S Shelly on behalf of Concord Community Schools (Shelly, Timothy) (Entered: 11/10/2015) |
| 11/16/2015 | 33 | Consent MOTION for Leave to File Excess Pages *and Attached Oversized Reply Brief in Support of Preliminary Injunction Motion* by Plaintiffs Jack Doe, John Doe, Freedom From Religion Foundation. (Attachments: # 1 Oversized Reply Brief in Support of Preliminary Injunction, # 2 Exhibit (Dep. of Spradling), # 3 Exhibit Dep. Exh. 1 (Notice of Dep.), # 4 Exhibit Dep. Exh. 2 (2010 Program), # 5 Exhibit Dep. Exh. 3 (2011 Program), # 6 Exhibit Dep. Exh. 4 (2012 Program), # 7 Exhibit Dep. Exh. 5 (2013 Program), # 8 Exhibit Dep. Exh. 6 (2014 Program), # 9 Exhibit Dep. Exh. 7 (2015 Program), # 10 Exhibit Dep. Exh. 8 (Choir Handbook), # 11 Exhibit Dep. Exh. 9 (Calendar), # |

6

| | | | |
|---|---|---|---|
| | | | 12 Exhibit Dep. Exh. 10 (Commitment Form), # 13 Exhibit Dep. Exh. 11 (Calendar), # 14 Exhibit Dep. Exh. 12 (Calendar))(Rose, Gavin) (Entered: 11/16/2015) |
| 11/17/2015 | 34 | | ORDER granting 33 Consent Motion for Leave to File Excess Pages for Reply Brief. This is a text–only order by Judge Jon E DeGuilio on 11/17/2015. (saj) (Entered: 11/17/2015) |
| 11/18/2015 | 35 | | REPLY to Response to Motion re 13 **MOTION for Preliminary Injunction** filed by Jack Doe, John Doe, Freedom From Religion Foundation. (Attachments: # 1 Exhibit Spradling Dep., # 2 Exhibit Dep. Exh. 1 – Notice of Dep., # 3 Exhibit Dep. Exh. 2 – 2010 Program, # 4 Exhibit Dep. Exh. 3 – 2011 Program, # 5 Exhibit Dep. Exh. 4 – 2012 Program, # 6 Exhibit Dep. Exh. 5 – 2013 Program, # 7 Exhibit Dep. Exh. 6 – 2014 Program, # 8 Exhibit Dep. Exh. 7 – 2015 Program, # 9 Exhibit Dep. Exh. 8 – Choir Handbook, # 10 Exhibit Dep. Exh. 9 – Calendar, # 11 Exhibit Dep. Exh. 10 – Commitment FOrm, # 12 Exhibit Dep. Exh. 11 – Calendar, # 13 Exhibit Dep. Exh. 12 – Calendar)(Rose, Gavin) (Entered: 11/18/2015) |
| 11/23/2015 | 36 | | STIPULATION by Plaintiffs Jack Doe, John Doe, Freedom From Religion Foundation. (Attachments: # 1 Exhibit 1 (2014 Script), # 2 Exhibit 2 (2015 Script), # 3 Exhibit 3 (2005 Program), # 4 Exhibit 4 (2006 Program), # 5 Exhibit 5 (2007 Program), # 6 Exhibit 6 (2008 Program), # 7 Exhibit 7 (2009 Program))(Rose, Gavin) (Entered: 11/23/2015) |
| 11/30/2015 | 37 | | ORDER granting 4 Motion to Proceed by Anonymous Name and Motion for Protective Order. Court ENTERS protective order as proposed by Plaintiffs. Signed by Magistrate Judge Christopher A Nuechterlein on 11/30/15. (mc) (Entered: 11/30/2015) |
| 11/30/2015 | 38 | | ORDER Joint Proposed Discovery due by 12/15/2015. Rule 16 Preliminary Pretrial Conference set for 1/7/2016 10:30 AM in US District Court – South Bend before Magistrate Judge Christopher A Nuechterlein. Signed by Magistrate Judge Christopher A Nuechterlein on 11/30/15. (slm) (Entered: 11/30/2015) |
| 11/30/2015 | 39 | | MAGISTRATE JUDGE CONSENT FORMS sent to all parties (Standard Track). (slm) (Entered: 11/30/2015) |
| 12/02/2015 | 40 | | OPINION AND ORDER: GRANTING 13 **MOTION for Preliminary Injunction** filed by John Doe, Jack Doe, Freedom From Religion Foundation. The Court ORDERS that Concord Community Schools is ENJOINED from organizing, rehearsing, presenting, or intentionally allowing to be presented, any portrayal of a nativity scene that is composed of live performers as part of its 2015 Christmas Spectacular shows. The Plaintiffs shall not be required to post any bond for this injunction to take effect. Signed by Judge Jon E DeGuilio on 12/2/2015. (lhc) (Entered: 12/02/2015) |
| 12/08/2015 | 41 | | MOTION to Attend Hearing Telephonically by Defendant Concord Community Schools. (Overholt, Anthony) (Entered: 12/08/2015) |
| 12/09/2015 | 42 | | ORDER granting 41 Motion to appear telephonically. PLAINTIFF AND DEFENDANT may attend the Rule 16 Preliminary Pretrial Conference telephonically on 01/07/2016.The court will call all counsel listed on the docket sheet unless it is notified that specified attorneys need not be contacted. If, at |

7

| | | | |
|---|---|---|---|
| | | | the time of the scheduled conference, you will not be at the telephone number identified on the docket please contact chambers. Approved by Magistrate Judge Christopher A Nuechterlein on 12/9/15. (slm) (Entered: 12/09/2015) |
| 12/15/2015 | 43 | | REPORT of Rule 26(f) Planning Meeting. (Rose, Gavin) (Entered: 12/15/2015) |
| 01/07/2016 | 44 | | TELEPHONIC RULE 16 PRELIMINARY PRETRIAL CONFERENCE held on 1/7/2016. before Magistrate Judge Christopher A Nuechterlein. Pla appeared by atty Rose. Dft appeared by atty Overholt. Any amendments to the pleadings to be filed by 2/7/2016. Discovery deadline is 7/1/2016. Plaintiff expert witness disclosures and reports to be delivered to the defendant by 2/26/2016. Defendant expert witness disclosures and reports to be delivered to the plaintiff by 3/25/2016. Initial Disclosures to be exchanged by 2/7/2016. Magistrate Consent forms due by 1/28/2016. (slm) (Entered: 01/07/2016) |
| 02/07/2016 | 45 | | AMENDED COMPLAINT *for Declaratory and Injunctive Relief and Nominal Damages* against Concord Community Schools, filed by Freedom From Religion Foundation, Jack Doe, John Doe, JOHN ROE, JOHN NOE. (Attachments: # 1 Exhibit 1 (FFRF Letter), # 2 Exhibit 2 (School Response))(Rose, Gavin) (Entered: 02/07/2016) |
| 02/07/2016 | 46 | | NOTICE of Appearance by Gavin M Rose on behalf of JOHN NOE, JOHN ROE (Rose, Gavin) (Entered: 02/07/2016) |
| 02/07/2016 | 47 | | MOTION to Proceed by Anonymous Name and for Protective Order by Plaintiffs JOHN NOE, JOHN ROE. (Attachments: # 1 Exhibit 1 (Aff. of Gaylor), # 2 Exhibit 2 (Aff. of Roe), # 3 Exhibit 3 (Aff. of Noe))(Rose, Gavin) (Entered: 02/07/2016) |
| 02/22/2016 | 48 | | *Defendant's* ANSWER to 45 Amended Complaint, by Concord Community Schools.(Wheeler, Thomas) (Entered: 02/22/2016) |
| 02/29/2016 | 49 | | ORDER GRANTING 47 MOTION to Proceed by Anonymous Name and for Protective Order by Plaintiffs JOHN NOE, JOHN ROE, as outlined in Order. Signed by Magistrate Judge Christopher A Nuechterlein on 2/29/2016. (lhc) (Entered: 02/29/2016) |
| 04/13/2016 | 50 | | Joint MOTION Set Summary Judgment Briefing Schedule and File Over−Sized Briefs by Plaintiffs Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe. (Rose, Gavin) (Entered: 04/13/2016) |
| 04/14/2016 | 51 | | ORDER granting 50 Joint MOTION to Set Summary Judgment Briefing Schedule and File Over−Sized Briefs . Plaintiffs' summary judgment motion & supporting memorandum due 4/29/2016 (limited to 35 pages); Defendant's summary judgment motion, supporting memorandum, and response brief to Plaintiffs' summary judgment motion due 5/27/2016 (limited to 35 pages); Plaintiff's reply brief and response brief to Defendant's summary judgment motion due 6/13/2016 (limited to 35 pages); and Defendant's reply brief due by 7/1/2016 (limited to 20 pages). This is a text−only order by Judge Jon E DeGuilio on 4/14/2016. (saj) (Entered: 04/14/2016) |
| 04/29/2016 | 52 | | MOTION for Summary Judgment by Plaintiffs Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe. (Attachments: # 1 Exhibit 1 (Video of 2015 Christmas Spectacular) (manually filed), # 2 Exhibit 2 (Supp. Aff. of John Doe), # 3 Exhibit 3 (Supp. Aff. of Jack Doe), # 4 Exhibit 4 (Supp. |

| | | | |
|---|---|---|---|
| | | | Aff. of John Roe), # <u>5</u> Exhibit 5 (Supp. Aff. of John Noe), # <u>6</u> Exhibit 6 (Supp. Aff. of Annie Laurie Gaylor), # <u>7</u> Exhibit 7 (Dfts.' Answers to Interrogs.), # <u>8</u> Exhibit 8 (Dfts.' Responses to RFP))(Rose, Gavin) (Entered: 04/29/2016) |
| 04/29/2016 | <u>53</u> | | NOTICE OF MANUAL FILING of Video of 2015 Christmas Spectacular by Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe (Rose, Gavin) (Entered: 04/29/2016) |
| 04/29/2016 | <u>54</u> | | MEMORANDUM in Support of <u>52</u> MOTION for Summary Judgment filed by Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe. (Rose, Gavin) (Entered: 04/29/2016) |
| 05/02/2016 | | | RECEIPT from Freedom From Religion Foundation (ACLU) of two copies of a DVD that was filed as a manual filing on 4/29/2016 <u>53</u> . (kds) (Entered: 05/05/2016) |
| 05/27/2016 | <u>55</u> | | Cross MOTION for Summary Judgment by Defendant Concord Community Schools. (Overholt, Anthony) (Entered: 05/27/2016) |
| 05/27/2016 | <u>56</u> | | BRIEF in Support of <u>55</u> Cross MOTION for Summary Judgment *and in Opposition of Plaintiff's Motion for summary Judgment* filed by Concord Community Schools. (Overholt, Anthony) (Entered: 05/27/2016) |
| 06/10/2016 | <u>57</u> | | RESPONSE to Motion re <u>55</u> Cross MOTION for Summary Judgment *and Reply in Support of Plaintiffs' Motion for Summary Judgment* filed by Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe. (Rose, Gavin) (Entered: 06/10/2016) |
| 06/28/2016 | <u>58</u> | | MOTION for Extension of Time to File Response/Reply *in Support of Summary Judgment* by Defendant Concord Community Schools. (Wheeler, Thomas) (Entered: 06/28/2016) |
| 06/29/2016 | 59 | | ORDER granting <u>58</u> Motion for Extension of Time to File Reply to <u>55</u> Reply to be filed by 7/5/2016.Approved by Magistrate Judge Christopher A Nuechterlein on 6/29/16. (slm) (Entered: 06/29/2016) |
| 07/05/2016 | <u>60</u> | | REPLY to Response to Motion re <u>55</u> Cross MOTION for Summary Judgment *and in Opposition of Plaintiffs' Motion for Summary Judgment* filed by Concord Community Schools. (Wheeler, Thomas) (Entered: 07/05/2016) |
| 07/07/2016 | 61 | | NOTICE: Because the discovery period in this case has now concluded and there are no pending non–dispositive motions, the referral to Magistrate Judge Christopher A Nuechterlein is now terminated. All further matters will now be handled by Judge Jon E DeGuilio unless otherwise directed. This entry constitutes the court's order on this matter and shall carry the same weight and authority as a written order signed by the judge. (slm) (Entered: 07/07/2016) |
| 09/14/2016 | <u>62</u> | 18 | OPINION AND ORDER: The Court takes both parties' motions for summary judgment under advisement as to the 2014 and proposed–2015 shows. The School's supplemental brief as to mootness is due by 10/5/2016, with any response by the Plaintiffs due by 10/26/2016. The Plaintiffs' supplemental brief as to the appropriate remedy, if any, for those shows is due by 10/5/2016, with any response from the School due by 10/26/2016. Finally, the Court GRANTS the School's motion for summary judgment as to the 2015 show, finding that it did not violate the Establishment Clause. The Court denies the Plaintiffs' motion for summary judgment to the same extent. Signed by Judge Jon E |

| | | | |
|---|---|---|---|
| | | | DeGuilio on 9/14/16. (jld) (Entered: 09/14/2016) |
| 10/04/2016 | 63 | | BRIEF *Defendant's Supplemental Brief on Mootness Issues* filed by Concord Community Schools. (Attachments: # 1 Affidavit of John Trout)(Wheeler, Thomas) Modified on 10/4/2016 to correct title (jld). (Entered: 10/04/2016) |
| 10/04/2016 | 64 | | SUPPLEMENT to 63 Supplement *Defendant's Supplemental Brief on Mootness Issues* filed by Concord Community Schools. (Attachments: # 1 Exhibit A to the Affidavit of Superintendent John Trout D#63)(Wheeler, Thomas) (Entered: 10/04/2016) |
| 10/05/2016 | 65 | | SUPPLEMENT *Plaintiffs' Supplemental Brief Concerning Relief* filed by Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe. (Rose, Gavin) (Entered: 10/05/2016) |
| 10/26/2016 | 66 | | MEMORANDUM in Opposition to 55 Cross MOTION for Summary Judgment *(Supplemental Response)* filed by Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe. (Attachments: # 1 Exhibit (Dec. 2015 and Jan. 2016 School Board Meeting Minutes))(Rose, Gavin) (Entered: 10/26/2016) |
| 10/26/2016 | 67 | | BRIEF *Defendant's Supplemental Brief on Propriety of Permanent Injunctive Relief and Nominal Damages.* (Wheeler, Thomas) (Entered: 10/26/2016) |
| 01/13/2017 | 68 | | MOTION to Withdraw as Attorney by Defendant Concord Community Schools. (Wheeler, Thomas) (Entered: 01/13/2017) |
| 01/16/2017 | 69 | | ORDER granting 68 Motion to Withdraw as Attorney. Attorney Thomas E Wheeler, II terminated. This is a text–only order by Judge Jon E DeGuilio on 1/16/2017. (saj) (Entered: 01/16/2017) |
| 03/06/2017 | 70 | | OPINION AND ORDER GRANTING IN PART 52 MOTION for Summary Judgment by Plaintiffs Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe. The Motion is GRANTED as to the 2014 and proposed 2015 shows. The 55 MOTION (Cross) for Summary Judgment by Defendant Concord Community Schools is DENIED to the same extent. Plaintiffs AWARDED nominal damages in the amounts of $7.00 to Jack Doe; $1.00 to John Doe; $1.00 to John Roe; and $1.00 to the Freedom From Religion Foundation. Plaintiffs' request for a declaratory judgment that the 2014 and proposed 2015 shows violated the Establishment Clause is GRANTED. Plaintiffs' request for a permanent injunction at this time is DENIED. Because the Court previously granted summary judgment in favor of Defendant as to the show that was actually performed in 2015, all claims in this action have now been resolved so the Clerk is DIRECTED to enter final judgment in accordance with these Orders. Signed by Judge Jon E DeGuilio on 3/6/17. (cer) (Entered: 03/06/2017) |
| 03/07/2017 | 71 | 55 | CLERK'S ENTRY OF JUDGMENT. (cer) (Entered: 03/07/2017) |
| 03/16/2017 | 72 | | Consent MOTION for Extension of Time to File *Petition for Attorneys' Fees and Costs* by Plaintiffs Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe. (Rose, Gavin) (Entered: 03/16/2017) |
| 03/16/2017 | 73 | | ORDER granting unopposed 72 Motion for Extension of Time to File. If no appeal is timely filed in this case, the plaintiffs are afforded a 60–day extension of time, to and including 5/22/2017 within which to seek an award of their attorneys' fees and costs. If an appeal is timely filed in this case, the plaintiffs |

| | | | |
|---|---|---|---|
| | | | are afforded an extension of time until 60 days after the finalization of that appeal within which to seek an award of their attorneys' fees and costs. This is a text–only order by Judge Jon E DeGuilio on 3/16/2017. (saj) (Entered: 03/16/2017) |
| 03/21/2017 | 74 | 12 | NOTICE OF APPEAL, filed by Plaintiffs Jack Doe, John Doe, Freedom From Religion Foundation, John Noe, John Roe. Filing fee $ 505, receipt number 0755–3199572. (Rose, Gavin) (Entered: 03/21/2017) |
| 03/21/2017 | 75 | 15 | Docketing Statement re: 74 Notice of Appeal filed by John Noe, John Doe, John Roe, Jack Doe, Freedom From Religion Foundation. (Rose, Gavin) (Entered: 03/21/2017) |

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:15-cv-00463-JD-CAN |
| CONCORD COMMUNITY SCHOOLS, | ) ) | |
| Defendant. | ) ) | |

**NOTICE OF APPEAL**

   **COME NOW** Plaintiffs Freedom From Religion Foundation, John Doe, Jack Doe, John Roe, and John Noe, by their counsel, and respectfully notify the Court and all other parties that they hereby appeal to the United States Court of Appeals for the Seventh Circuit from the Opinion and Order entered on September 14, 2016 (ECF No. 62) and the Judgment in a Civil Action entered on March 7, 2017 (ECF No. 71).

   **WHEREFORE,** the plaintiffs hereby file their Notice of Appeal, and request all proper relief.

*/s/ Gavin M. Rose*
Gavin M. Rose,
ACLU OF INDIANA
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
grose@aclu-in.org

1

Sam Grover, *Pro Hac Vice*
Ryan Jayne, *Pro Hac Vice*
FREEDOM FROM RELIGION FOUNDATION
P.O. Box 750
Madison, WI  53701
608/256-8900
fax: 608/204-0422
sgrover@ffrf.org
rjayne@ffrf.org

Daniel Mach, *Pro Hac Vice*
Heather L. Weaver, *Pro Hac Vice*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street, N.W., Ste. 600
Washington, D.C. 20005
202/675-2330
fax: 202/546-0738
dmach@dcaclu.org
hweaver@aclu.org

*Attorneys for the plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically on this 21st day of March, 2017.  Parties may access this document through the Court's electronic system.  The following persons will be served with this filing by operation of the Court's electronic system:

Anthony Overholt
<aoverholt@fbtlaw.com>


*/s/ Gavin M. Rose*
Gavin M. Rose
Attorney at Law

3

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:15-cv-00463-JD-CAN |
| CONCORD COMMUNITY SCHOOLS, | ) ) ) | |
| Defendant. | ) | |

**DOCKETING STATEMENT**

**COME NOW** Plaintiffs, by their counsel, and file their Docketing Statement pursuant to Circuit Rule 3(c)(1).

1.　　The district court had original jurisdiction of this case pursuant to 28 U.S.C. §§ 1331 and 1343.  The district court's federal question jurisdiction was based on an alleged violation of the First Amendment to the United States Constitution.

2.　　No party is a corporation, unincorporated association, or partnership.

3.　　The Court of Appeals has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 inasmuch as this is an appeal following the final judgment of the district court entered on March 7, 2017.  This appeal is taken from the Opinion and Order entered on September 14, 2016 (ECF No. 62) and the Judgment in a Civil Action entered on March 7, 2017 (ECF No. 71).

4.　　No motion for a new trial or for alteration of the judgment or any other motion that tolls the time within which to appeal has been filed in this matter.

5.　　The Notice of Appeal was filed on this date, March 21, 2017.

6.　　This is not an appeal from a decision of a magistrate judge.

1

7.      There are no prior or related appellate proceedings.

8.      No party appears in this appeal in his or her official capacity.

        **WHEREFORE**, the plaintiffs respectfully file their Docketing Statement, and request all

proper relief.

                                        _/s/ Gavin M. Rose_
                                        Gavin M. Rose,
                                        ACLU OF INDIANA
                                        1031 E. Washington St.
                                        Indianapolis, IN 46202
                                        317/635-4059
                                        fax: 317/635-4105
                                        grose@aclu-in.org

                                        Sam Grover, _Pro Hac Vice_
                                        Ryan Jayne, _Pro Hac Vice_
                                        FREEDOM FROM RELIGION FOUNDATION
                                        P.O. Box 750
                                        Madison, WI  53701
                                        608/256-8900
                                        fax: 608/204-0422
                                        sgrover@ffrf.org
                                        rjayne@ffrf.org

                                        Daniel Mach, _Pro Hac Vice_
                                        Heather L. Weaver, _Pro Hac Vice_
                                        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                        915 15th Street, N.W., Ste. 600
                                        Washington, D.C. 20005
                                        202/675-2330
                                        fax: 202/546-0738
                                        dmach@dcaclu.org
                                        hweaver@aclu.org

                                        _Attorneys for the plaintiffs_

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true copy of the foregoing was filed electronically on this 21st day of March, 2017.  Parties may access this document through the Court's electronic system.  The following persons will be served with this filing by operation of the Court's electronic system:

Anthony Overholt
<aoverholt@fbtlaw.com>

<u>*/s/ Gavin M. Rose*</u>
Gavin M. Rose
Attorney at Law

3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:15-CV-463 JD |
| CONCORD COMMUNITY SCHOOLS, | ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This began as a case about a living nativity scene. For the finale of its annual holiday show, called the Christmas Spectacular, Concord High School would present a living nativity scene during which students in costumes portrayed various nativity figures, while multiple ensembles from a cross-section of the performing arts department played a number of religious songs and a faculty member read excerpts from the Bible telling the story of Jesus' birth. This practice continued for many years. In 2015, however, a student and his father, along with the Freedom From Religion Foundation, filed suit, asserting that the religious content of the Christmas Spectacular violated the Establishment Clause. In response, the School made some changes to that portion of the show, proposing to omit the Bible readings and to add songs celebrating other winter holidays. The Court found, though, that even with those changes, the proposed show was still likely to violate the Establishment Clause, so the Court granted the Plaintiffs' request to enjoin the presentation of a living nativity scene as part of the 2015 shows.

The show that was actually performed in 2015 thus bore little resemblance to the religious presentations of previous years. It did not include any Bible readings or a living nativity scene—the two subjects of the Plaintiffs' motion for a preliminary injunction. And while the

show did include a brief display of a nativity scene (composed of mannequins), that scene was on stage for less than two minutes as the visual complement to a single song performed by a single ensemble. The presentation of the nativity scene was thus not differentiated from the rest of the show, which featured a wide and engaging variety of visuals to augment the respective musical performances, including images and videos projected onto screens, dancing, choreography, costumes, and lighting displays.

After the 2015 show, the Plaintiffs amended their complaint to assert Establishment Clause challenges against each of those three versions of the show—the show as it was performed in 2014 (and previous years); as it was proposed in 2015, prior to the preliminary injunction; and as it was actually performed in 2015. The parties have now filed cross-motions for summary judgment. For the reasons that follow, the Court finds that the show that was actually performed in 2015 did not violate the Establishment Clause. As to the first two shows, the Court orders supplemental briefing as to whether those claims remain live, and as to what remedy may be appropriate.

## I.  FACTUAL BACKGROUND

Concord Community Schools is a public school corporation located in Elkhart County, Indiana. It serves approximately 5,300 students from four elementary schools, one intermediate school, one junior high school, and one high school—Concord High School, which has an enrollment of about 1,700 students. Concord High School has a performing arts department that involves approximately half of the students at the school. The department includes a marching band, three different concert bands, two jazz bands, a pep band, a string orchestra, a symphony orchestra, and six different performance and show choirs. The department also offers other artistic outlets, with programs in dance, theatre, and stagecraft.

The performing arts department presents a number of programs throughout the school year that allow the students to experience performing in front of live audiences. Those include an annual musical, a variety show, a band festival, a choral pops concert, a jazz café, and a Christmas show, which is at issue here. The Christmas show originated in 1970 after the marching band attended the Radio City Christmas Spectacular during a trip to New York City. Every year since then, the School has presented the Christmas Spectacular, modeled after the Radio City version, as its holiday show. The Christmas Spectacular typically includes performances from two string orchestras, a symphony orchestra, a concert band, two jazz bands, five choirs, and small chamber groups. It also includes dance teams, students from the drama program, and stage technicians, and involves over 600 students in total. The Christmas Spectacular is performed five times each year, including four public performances over a weekend, and a school-day performance for younger students in the district on a Friday.

The Christmas Spectacular traditionally runs about ninety minutes long, plus a fifteen minute intermission. The first portion of the show runs for about sixty minutes, and includes about twenty songs performed by the various ensembles. In the 2014 show, each of the songs for this portion of the show were listed on one page of the program under the heading "The Magic of Christmas." This portion of the show was made up of secular songs relating to the Christmas season, like Jingle Bells, Deck the Halls, Carol of the Bells, Let it Snow, and White Christmas. Each song was generally performed by a different ensemble than the last, and the performances included a variety of visual complements to the musical performances, including images projected onto screens next to the stage, dancing, choreography, and lighting displays. Some performances also included costumes, props, and backdrops, and the auditorium was decorated in a holiday theme, with Christmas trees, lights, and garland.

3

Each of the songs following the intermission in the 2014 show were listed on the next page of the program under the heading "The Spirit of Christmas." This portion of the show began with three songs related to the religious Christmas holiday. The rest of the songs, which lasted about twenty minutes, were listed in the program under the subheading "The Story of Christmas," and one of the ensembles performing during this portion was listed as the "Nativity Orchestra." This segment of the show had been performed in nearly the same manner since the Christmas Spectacular was first presented. It began with an announcement by a faculty member, stating: "Ladies and gentlemen: As we now present the Story of Christmas, we ask that you please hold your applause until the conclusion." [DE 36-1]. Thereafter, the faculty narrator, reading from a script, told the story of the birth of Jesus, reciting portions of the story as it appears in the Bible, as the various ensembles played a medley of ten songs, including Angels We Have Heard On High, Away in a Manger, We Three Kings, and Hark, the Herald Angels Sing. Parts of the narration were read over the musical performances, while other portions were read in between. During the third song, O Little Town of Bethlehem, a backdrop depicting a landscape scene appeared in front of the orchestra on stage, and students dressed in costumes as Mary and Joseph slowly walked across the front of the stage, as if walking to Bethlehem.

After a choir sang another song, the curtain raised to reveal a nativity scene on stage. The students dressed as Mary and Joseph stood over a manger inside a set depicting a stable. On each side of Mary and Joseph inside the stable stood three students dressed in white robes, portraying angels. More students dressed as shepherds stood on the sides of the stage outside of the stable. All of the students stood still in their places for the final twelve minutes of the show, while six songs were played. During the third-to-last song, We Three Kings, three more students dressed as the three wise men slowly walked on stage, one at a time, and took their place in front of the

4

nativity scene, as if presenting their gifts to Jesus. Once the performers concluded the final song, a recorded version of Joy to the World began playing, and the nativity scene remained on stage for about another forty-five seconds as the audience applauded, until the curtain dropped.

After the performance of the 2014 show, the Freedom From Religion Foundation sent a letter to the School, objecting to the presentation of the Christmas Spectacular as a violation of the Establishment Clause. The Freedom From Religion Foundation is a not-for-profit organization that advocates for the separation of church and state, and it wrote the letter on behalf of one of its members, John Doe,[1] a parent of a student who had performed in the 2014 show. After receiving the letter, the School's superintendent read a statement at a school board meeting on September 8, 2015, during which he defended the Christmas Spectacular and indicated that the School would not comply with the Freedom From Religion Foundation's request to remove the religious aspects of the show.

Accordingly, on October 7, 2015, the Freedom From Religion Foundation filed suit, along with John Doe and his son, Jack Doe. They then moved for a preliminary injunction, asking the Court to prohibit the School from including the live nativity scene and the Bible readings portraying the story of the birth of Jesus as part of the Christmas Spectacular. [DE 13]. After the motion was filed, the School indicated that it intended to make two changes to the show as compared to previous shows. First, it decided to omit the narration that included the Bible readings. Second, it added songs pertaining to Chanukah and Kwanzaa in the second half of the show. The School planned to have the show resume after the intermission with one of the string ensembles playing "Ani Ma'Amin," in reference to Chanukah, after which one of the choirs

---

[1] The magistrate judge granted motions for each of the individual plaintiffs to proceed anonymously in this action. [DE 37, 49].

5

would sing "Harambee," in reference to Kwanzaa. During each of those performances, images

reflecting those holidays would be projected onto screens next to the stage, such as a menorah or

a dreidel for Chanukah, and candles or a mat for Kwanzaa. After those songs, the Christmas

segment would then be performed the same as in the past, except for the narration. In addition,

each of the three holidays would be introduced by a student reading a short script noting the

cultural significance of the respective holiday. The Chanukah and Kwanzaa segments were

expected to last three or four minutes each, while the Christmas segment, as before, would last

about twenty minutes, with the nativity scene on stage for the final twelve minutes. Ultimately,

the Court found that the show as proposed by the School was still likely to violate the

Establishment Clause as an endorsement of religion, so it granted the Plaintiffs' motion for a

preliminary injunction. The School had already agreed to omit the narration from the Bible about

Jesus' birth, but the Court granted the Plaintiffs' remaining request and enjoined the School from

presenting a nativity scene composed of live performers as part of the 2015 Christmas

Spectacular shows.

        As in past years, the Christmas Spectacular that the School presented for its performances

in December 2015 began with about twenty individual performances by many of the School's

bands, orchestras, and choirs, as well as several solos and small-group performances.[2] These

performances were almost entirely secular in nature, and were not affected by the injunction. As

in the past, they also included a wide range of visual complements to the musical performances.

For example, two string ensembles played songs by the Trans-Siberian Orchestra, during which

they stood towards the front of the stage with the lights dimmed, while stage lights overhead

---

[2] This description of the show is based on a video recording of the live performance, which has
been filed as an exhibit. [DE 53].

6

presented a light show in synch with the music. The dance team performed for two songs in which they presented choreographed dance routines using costumes and props, one of which was accompanied by the combined bands. Many of the choir pieces included choreography, dancing, and movement about the stage. During other songs, images were projected onto screens to the sides of the stage, or videos were projected onto a screen over the center of the stage. Still others included backdrops, stage decorations, or costumes. This portion of the show lasted about seventy-three minutes, concluding with the intermission.

After the intermission, the show resumed with a student reading the following introduction: "Welcome to the Spirit of the Season, where we observe the many cultural celebrations during this holiday season." She then continued with an introduction of Chanukah:

> Our first holiday we will celebrate tonight is Chanukah, also known as the Festival of Lights. Chanukah is a Jewish holiday commemorating the rededication of the Holy Temple, also known as the Second Temple, in Jerusalem. Chanukah is observed for eight days and nights, by the lighting of a candle held in a unique candelabrum, called a menorah, each night of the holiday. "I Believe" is the English translation for the title of our first selection that is performed during Chanukah. Performing Ani Ma'Amin, here are the Concord Chamber Strings.

The string ensemble then played Ani Ma'Amin, which lasted about four minutes, as images reflecting Chanukah and the Jewish faith were projected onto the screen to the side of the stage.

After that performance concluded, the student then read the following introduction of Kwanzaa:

> Kwanzaa is a week-long celebration held in the United States and in other nations where Western African population centers exist. The celebration honors African heritage in African-American culture, and is observed the last week of the year, culminating on January 1st with a feast and gift-giving. Kwanzaa possess seven core principles represented by seven candles. Harambee is chanted after the 6th day of celebration dedicated to creativity. Please enjoy the Symphonic Choir as we celebrate Kwanzaa with Harambee!

The choir then sang Harambee, as images associated with Kwanzaa were projected onto the screens. This performance also lasted about four minutes.

The remaining songs during the show were each associated with the Christian Christmas holiday. These performances, including the spoken introduction, lasted about twenty-two minutes. After a choir sang a song entitled One Amazing Night, the student read the following introduction for the Christmas holiday:

> Our country's Christmas season originated and is based on the Christian celebration of the birth of Jesus Christ. The Bible tells the story that Jesus was born to poor parents in a small town; angels announced his birth and he received many visitors, from shepherds to kings, in the manger where he was born. He worked as a carpenter and for three years as a traveling preacher. He had no family and never traveled far from his birthplace. The Bible recites that in his early 30s, Jesus was tried and executed. His life, particularly his birth and death, now serve as the basis of the celebration of two major holidays widely recognized by many throughout the United States and the world.

Various ensembles then performed the final eight pieces of the show. As compared to the proposed version of the show, two of the proposed songs during this sequence were removed, while one, a piano solo, was added. As before, the image of an angel was projected on the side screen as a choir sang Angels We Have Heard on High. However, no student actors walked across stage during the performance of O Little Town of Bethlehem, as they had in the past.

After the piano solo, the main curtain lifted to reveal a nativity scene on stage. Given the injunction, the scene did not include any student performers. Instead, five mannequins, depicting Mary, Joseph, and the three wise men, were situated inside the stable set. Unlike previous years, no angels were inside the stable and no shepherds were outside of it. The choir then sang O Holy Night, after which the lights dimmed and the nativity scene was not seen again. In total, the nativity scene was on stage for less than two minutes. The show then concluded with two songs jointly performed by the choirs and orchestra, after which a recording of Joy to the World played while the audience filed out of the auditorium.

After the performances of this show, the Plaintiffs filed an amended complaint. In addition to challenging the show that the School presented in 2014, the amended complaint

added claims challenging the versions of the show that the School proposed to present in 2015,

prior to the issuance of the preliminary injunction, and the show that the School actually

presented in 2015. As to each of those three versions of the show, the Plaintiffs seek a

declaratory judgment that the show was unlawful and a permanent injunction against presenting

those versions of the show in the future. They also seek nominal damages and attorneys' fees.

Finally, the amended complaint added two additional plaintiffs, both of whom are individuals

with family members who have performed in the Christmas Spectacular. After a brief period for

discovery, the parties have both moved for summary judgment, and those motions have been

fully briefed.

## II.  STANDARD OF REVIEW

On summary judgment, the moving party bears the burden of demonstrating that there "is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  A "material" fact is one identified by the substantive law as

affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

"genuine issue" exists with respect to any material fact when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Id*.  Where a factual record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co.

v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391

U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court

must construe all facts in the light most favorable to the non-moving party and draw all

reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697

(7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the

non-moving party cannot simply rest on the allegations contained in its pleadings, but must

present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

### III. DISCUSSION

The Plaintiffs assert that three different versions of the Christmas Spectacular violated the Establishment Clause: (1) the version presented in 2014; (2) the version the School proposed to present in 2015 prior to the issuance of the preliminary injunction; and (3) the version the School actually presented in 2015. The Court addresses the first two versions together, as they share common questions as to the Court's continuing jurisdiction and as to what remedies may be appropriate should the Court adjudicate those claims in the Plaintiffs' favor. The Court then addresses the 2015 show that was actually performed.

**A.     Christmas Spectaculars as Performed in 2014 and Proposed in 2015**

The Plaintiffs argue that the versions of the Christmas Spectacular that the School performed in 2014 and that it proposed to perform in 2015 prior to the issuance of the preliminary injunction each violated the Establishment Clause. In issuing the preliminary injunction, the Court found that the Plaintiffs had shown a likelihood of success of proving that the proposed 2015 show would violate the Establishment Clause. The Plaintiffs argue for those same reasons that they are now entitled to judgment as a matter of law that the proposed 2015 show would in fact have violated the Establishment Clause. They further argue that the 2014 version, which placed even greater emphasis on religion and Christianity, violated the Establishment Clause as well.

In response, the School does not present any argument in defense of the constitutionality of those versions of the show. The Court does not adjudicate the merits of these claims at this time, however, because there are two other questions that need further consideration, one of

10

which goes to the Court's jurisdiction to decide these issues: first, whether the Plaintiffs'

challenges to these shows have become moot, such that the Court lacks the power to adjudicate

them; and second, what remedy may be appropriate should the Court reach the merits and

resolve these claims in the Plaintiffs' favor.

### 1.     Mootness

The School argues that the Plaintiffs' challenges to the 2014 show and the proposed 2015

show are moot. It argues that it has made changes since those versions of the show and does not

intend to present those versions in the future, so there is no longer a live controversy as to

whether those shows complied with the Establishment Clause. The School did not raise the issue

until its surreply,[3] though, and it failed to cite any facts in the record in support of its argument.

The Plaintiffs' previous briefs also made only passing references to mootness. Thus, the Court

finds that the existing filings are inadequate to resolve this issue, so it will require supplemental

filings with legal and factual support for the parties' positions in light of the discussion below.

Article III of the Constitution states that the power of the federal courts extends to

"cases" and "controversies." U.S. Const. art. III, § 2. Thus, "[u]nder Article III, 'cases that do not

involve actual, ongoing controversies are moot and must be dismissed for lack of jurisdiction.'"

*Wisc. Right to Life, Inc. v. Schober*, 366 F.3d 485, 490–91 (7th Cir. 2004) (quoting *Fed'n of*

*Advert. Indus. Representatives, Inc. v. City of Chi.*, 326 F.3d 924, 929 (7th Cir. 2003)). Mootness

has been described as "the doctrine of standing set in a time frame: The requisite personal

interest that must exist at the commencement of the litigation (standing) must continue

throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68

---

[3] The filing is titled as the School's reply in support of its cross-motion for summary judgment, but given the sequence of the briefing on the motions for summary judgment, the filing is functionally the School's surreply.

n.2 (1997). That description is imprecise, though, as there are some notable differences between the two. *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189–90 (2000) (noting that this description of mootness "is not comprehensive"). Unlike standing, on which a plaintiff bears the burden of proof, the burden of proving that a controversy is moot lies with the party asserting mootness, which is usually the defendant. *Laidlaw*, 528 U.S. at 190; *Schober*, 366 F.3d at 491. The Supreme Court has also acknowledged that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Laidlaw*, 528 U.S. at 190.

A case can become moot if the conduct a plaintiff seeks to stop comes to an end on its own, in which case the result a plaintiff is seeking has already occurred. However, "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Laidlaw*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1983)); *see also Chi. United Indus., Ltd. v. City of Chi.*, 445 F.3d 940, 947 (7th Cir. 2006) ("It is true that the mere cessation of the conduct sought to be enjoined does not moot a suit to enjoin the conduct, lest dismissal of the suit leave the defendant free to resume the conduct the next day."). Only when "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" will a case become moot by voluntary cessation. *Laidlaw*, 528 U.S. at 189; *accord Doe ex rel. Doe v. Elmbrook Sch. Dist.* (*Elmbrook I*), 658 F.3d 710, 719 (7th Cir. 2011), *adopted in pertinent part en banc*, 687 F.3d 840, 842–43 (7th Cir. 2012). The Supreme Court has described this burden of proof as "stringent," "heavy," and "formidable." *Laidlaw*, 528 U.S. at 189–90. When the defendants are public officials, though, courts "place greater stock in their acts of self-correction, so long as they appear genuine." *Schober*, 366 F.3d at 492.

12

The Seventh Circuit addressed a mootness-by-voluntary-cessation argument in a context similar to this case in *Elmbrook I*, 658 F.3d at 718–21.[4] There, the plaintiffs challenged a public high school's practice of holding graduation ceremonies in a church. After the suit was filed, the school moved its ceremonies back to school property, and at the time the case reached the court of appeals, the school had no intention of holding any future ceremonies at the church. The court thus observed that "the likelihood that the District will again use the Church for a graduation ceremony . . . certainly has decreased" since the litigation began. *Id.* at 719. The court nonetheless held that the claim for prospective relief was not moot. Unlike cases where a defendant moots a case by repealing a challenged statute or ordinance, or expressly disavowing a challenged policy, the school presented "no evidence of a formal or even an informal policy change regarding graduation ceremonies," and the school did not officially rule out using the church in the future. *Id.* at 720. And though the school asserted that it had no present intent of using a church again, no official policy would have prevented or even obstructed the school from returning the ceremonies to the church should its inclination change, so the Seventh Circuit found that the request for prospective relief remained live.

Here, the School declares in its surreply that it "has made it clear that it will not return to the pre-2015 program," [DE 60 p. 5], but it fails to cite even a single piece of evidence to support that assertion. The evidence that is actually in the record is not so conclusive, either. Following the 2015 show, the School's superintendent stated in response to an interrogatory that "[a]t this time, [the School] does not anticipate making significant changes to the program in future years."

---

[4] The *en banc* Seventh Circuit reversed this opinion as to the merits of the underlying claim, but adopted the opinion's analysis as to mootness. *Doe ex rel. Doe v. Elmbrook Sch. Dist.* (*Elmbrook II*), 687 F.3d 840, 842–43 (7th Cir. 2012) ("We adopt the panel's original analysis on the issue[] of justiciability . . . .").

13

[DE 52-7]. That statement is plainly insufficient in a number of respects to establish mootness. First, it does not reflect a commitment *not* to present the previous versions of the show, it merely indicates that "[a]t this time," the School "does not anticipate" doing so. As the Seventh Circuit held in *Elmbrook*, the lack of a present intent to resume the challenged conduct is not equivalent to a commitment not to resume that conduct. 658 F.3d at 720. Second, by qualifying this statement as representing the School's intent "[a]t this time," the School does not make clear what, if anything, might affect that intent. Perhaps the School does not intend to change the show at this time, during the pendency of litigation, but may wish to present the previous versions of the show should it prevail in this litigation.[5] And third, this statement is vague, as it does not indicate what "significant changes" would entail; the School may or may not characterize the proposed 2015 show as representing a "significant change" from the actual 2015 show, for example.

The School also asserts (again, without citing any evidence) that "the evidence is undisputed that [the School] had already made significant changes even before this suit was filed." [DE 60 p. 5]. That argument directly contradicts the School's argument at the preliminary injunction stage, though, which was that this case was not ripe because the School had not yet decided the content of the upcoming show. [DE 26 p. 10–11]. Nor is the School's presentation of a modified show in 2015 enough on its own to moot the Plaintiffs' challenge to the previous versions. In *Elmbrook*, the school had not held its most recent graduation ceremonies at the church, yet that did not moot the case. 658 F.3d at 719–20. In fact, even when a defendant repeals a challenged ordinance and replaces it with a different ordinance, a challenge to the

---

[5] In addition, the interrogatory that this statement responded to asked about the School's intentions should the preliminary injunction become permanent, so this statement does not give assurance that the School will not resume this conduct should these claims be dismissed.

repealed ordinance will not be moot if it is "sufficiently similar" to the new ordinance. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662, n.3 (1993); *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 287–88 (7th Cir. 2014).

Finally, in a footnote, the Plaintiffs acknowledge testimony by the School's music director from a deposition taken before the preliminary injunction issued, in which he stated that the changes incorporated into the proposed 2015 show were "permanent." [DE 33-2 p. 48]. That testimony makes a stronger case for mootness as to the 2014 show (but at the same time would undermine a case for mootness as to the proposed 2015 show). The director also acknowledged, though, that this was not any official or unofficial policy or position of the School, but only a decision he had made as the director. It is also unclear whether that testimony reflected a commitment not to return to the previous version, or merely a lack of a present intent to do so, and neither party has provided any explanation or analysis on those points.

For those reasons, the Court cannot conclude at this time that the School has met its heavy burden of establishing that the claims for prospective relief as to the 2014 and proposed-2015 shows are moot due to voluntary cessation. However, mootness affects a court's subject matter jurisdiction to decide a claim, so a court has a duty to inquire further when the prospect of mootness is present. *Elmbrook I*, 658 F.3d at 718–19 (noting that the court raised the issue of mootness *sua sponte* and ordered supplemental briefing to confirm its jurisdiction). And given the limited briefing and support that has been presented thus far, requiring additional briefing is the appropriate course. Accordingly, the Court directs the parties to submit supplemental briefs as to whether the Plaintiffs' claims for prospective relief as to the 2014 and proposed-2015 shows are moot. The parties should also submit any additional evidence pertinent to that issue.

There is another aspect of mootness that bears further exploration, too. The Plaintiffs state in a footnote that, even if their request for prospective relief (a declaratory judgment and a permanent injunction) as to these shows is moot, their claim as to the 2014 show is still live and justiciable as to their request for nominal damages.[6] While that proposition has been accepted by some courts, it has been rejected by multiple district courts in this circuit, and has received criticism elsewhere.[7] Neither party cited any authority or attempted to present any analysis on this issue, though. Accordingly, the parties should also address in their supplemental filings whether the Plaintiffs' claim for nominal damages as to the 2014 show can alone keep that claim live should their request for prospective relief as to that claim be deemed moot.

---

[6] Since the proposed 2015 show was never performed, the Plaintiffs have no basis to request nominal damages as to that show. In addition, the Plaintiffs do not seek any actual damages as to any show.

[7] *Compare Freedom From Religion Found., Inc. v. Franklin Cty., Ind.*, 133 F. Supp. 3d 1154, 1158–60 (S.D. Ind. 2015) ("By allowing FFRF to proceed to determine the constitutionality of a policy that has been voluntarily amended to cease illegal conduct, in hope of receiving $1.00, vindicates no rights and is not a task of the federal courts."), *Freedom From Religion Found., Inc. v. City of Green Bay*, 581 F. Supp. 2d 1019, 1029–33 (E.D. Wis. 2008) ("Because an award of nominal damages is virtually indistinguishable from a declaratory judgment which, like Plaintiffs' claim for injunctive relief, I have already found nonjusticiable, I conclude that the Plaintiffs' nominal damages request does not prevent dismissal."), *and Freedom From Religion Found., Inc. v. Orange Cty. Sch. Bd.*, 610 F. App'x 844, 848 n.3 (11th Cir. 2015) (holding that a claim for nominal damages does not save an otherwise-moot claim), *with Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257–58 (10th Cir. 2004) ("It may seem odd that a complaint for nominal damages could satisfy Article III's case or controversy requirements, when a functionally identical claim for declaratory relief will not. But this Court has squarely so held."); *see also Freedom From Religion Found., Inc. v. New Kensington Arnold Sch. Dist.*, No. 15-3083, 2016 WL 4191499, at *9 (3d Cir. Aug. 9, 2016) (Smith, J., concurring) (writing separately to express "skepticism that a claim for nominal damages alone would suffice to create standing or save a case from mootness"); *Utah Animal Rights Coal.*, 371 F.3d at 1262 (McConnell, J., concurring) ("[T]he proposition that a claim for nominal damages automatically precludes mootness is inconsistent with fundamental principles of justiciability.).

16

## 2.    Remedy

The second question as to the 2014 and proposed-2015 shows that requires additional briefing is what remedy should be awarded if those claims are resolved on their merits in the Plaintiffs' favor. The Plaintiffs seek a permanent injunction, a declaratory judgment, and nominal damages. While they spend considerable time arguing in support of their request for $1 per performance in nominal damages, the entirety of their argument for a permanent injunction is that they "are . . . entitled to injunctive relief enjoining the School Corporation from staging the challenged program in any of its three forms." [DE 54 p. 30]. A permanent injunction does not inevitably follow from any finding that a right has been violated, though. *Badger Catholic, Inc. v. Walsh*, 620 F.3d 775, 782 (7th Cir. 2010). Rather, a party seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007) (holding that the court had a duty to consider the appropriateness of a permanent injunction even when the defendant was in default and did not respond to the request). The Plaintiffs have made no attempt to do so here. In addition, even if any changes to the show do not result in these claims being moot, those changes may still affect whether a permanent injunction is an appropriate remedy. *Laidlaw*, 528 U.S. at 193 (citing *City of Mesquite*, 455 U.S. at 289 for the proposition that "Although the defendant's voluntary cessation of the challenged practice does not moot the case, '[s]uch abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice'" (alteration in original)).

A related issue that needs to be addressed is the scope and construction of any permanent injunction. Rule 65(d) requires every injunction to "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "[A] court has an independent duty to assure that the injunctions it issues comply with" these requirements. *Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 631–32 (7th Cir. 2003) (internal citation omitted). The Plaintiffs' request for "an injunction prohibiting the presentation of any of the three versions of the event at issue in this litigation" fails to comply with those requirements, as it is neither specific nor self-contained. [DE 54 p. 33]. In addition, as the Court noted at the preliminary injunction stage, the fact-intensive nature of these claims makes crafting an appropriate injunction particularly challenging. *Books v. City of Elkhart, Ind.* (*Books I*), 235 F.3d 292, 307 (7th Cir. 2000) ("In crafting equitable relief to comply with our judgment today, the district court must ensure that, although the condition that offends the Constitution is eliminated, Elkhart retains the authority to make decisions regarding the placement of the monument."). That is also a factor to consider in deciding whether an injunction is justified. *Badger Catholic*, 620 F.3d at 782 ("As for the choice between declaratory judgment and an injunction: that's a matter left to the district judge's discretion . . . . The problem with issuing an injunction straight off is that the details required by Fed.R.Civ.P. 65(d)(1)(C) would be considerably more elaborate than the terms of a declaratory judgment. The district judge was not looking for an opportunity to take over management of the University's activity-fee program. If the entry of a regulatory injunction can be avoided by a simpler declaratory judgment, everyone comes out ahead.").

Accordingly, the Court directs the parties to submit supplemental briefs addressing whether a permanent injunction is warranted if Plaintiffs prevail on these claims on their merits,

and, if so, what specific injunction should issue. In particular, the Plaintiffs' filing must include a proposed injunction and explain both why that particular injunction is warranted and how it complies with Rule 65(d).

**B.      Christmas Spectacular as Performed in 2015**

The Plaintiffs also challenge the version of the Christmas Spectacular that was actually presented in 2015. The Court can proceed to the merits of this claim, as there is no question that it presents a live and justiciable controversy. The School has given no indication that this claim may be moot, and in fact has stated that it does not anticipate making significant changes to the program in future years. The Plaintiffs also have standing to challenge this show. The individual plaintiffs have come, or will come, into direct and unwelcome contact with the display to which they object—Jack Doe as a student performer in the show, and the remaining individual plaintiffs as attendees with children or family members in the show. Under the existing law of the Seventh Circuit, that gives these plaintiffs the requisite interest to have standing. *Books v. Elkhart Cty., Ind.* (*Books II*), 401 F.3d 857, 861 (7th Cir. 2005) (holding that a party has standing to raise an Establishment Clause challenge if they "must come into direct and unwelcome contact with the religious display to participate fully as a citizen and to fulfill legal obligations"); *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 507 (7th Cir. 2010) (holding that a student at a public school who was exposed to a practice that allegedly violated the Establishment Clause had standing to challenge that practice); *Croft v. Governor of Tex.*, 562 F.3d 735, 746 (5th Cir. 2009) (likewise as to parents). The Freedom From Religion Foundation also has associational standing since one of its members has standing, the interests it seeks to protect are germane to its organizational purpose, and neither the claim asserted nor the relief requested requires the participation of individual members, as it is not seeking compensatory damages. *Hunt v. Wash.*

19

*State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011).

The Court therefore considers whether the 2015 show complied with the Establishment Clause. The First Amendment states, in part, that "Congress shall make no law respecting an establishment of religion . . . ." U.S. Const. amend I, cl. 1. Though this provision specifically refers to Congress, courts have held that the Fourteenth Amendment made this provision equally applicable to state and municipal governments. *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947); *Elmbrook II*, 687 F.3d at 849. In *Lemon v. Kurtzman*, the Supreme Court articulated a three-pronged test to identify violations of the Establishment Clause: Under the *Lemon* test, a governmental practice violates the Establishment Clause if it (1) lacks a legitimate secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive entanglement with religion. 403 U.S. 602, 612–13 (1971). The Seventh Circuit recognizes that this test "'remains the prevailing analytical tool for the analysis of Establishment Clause claims.'" *Elmbrook II*, 687 F.3d at 849 (quoting *Books I*, 235 F.3d at 301).

The Supreme Court has also articulated two other approaches by which an Establishment Clause violation can be detected. *Id.* First, a governmental practice violates the Establishment Clause if it has "'the effect of communicating a message of government endorsement or disapproval of religion.'" *Id.* (quoting *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring)); *see also Cty. of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 592–93 (1989). Under that test, a court must "'assess the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion.'" *Elmbrook II*, 687 F.3d at 850 (quoting *Books I*, 235 F.3d at 304). The Seventh circuit has "viewed the endorsement test as a legitimate part of

20

*Lemon's* second prong," *id.*, so the Court uses this test to apply *Lemon's* primary-effect prong. *See Sherman*, 623 F.3d at 517 (articulating *Lemon's* primary-effect prong as asking, "irrespective of government's actual purpose, whether the practice under review in fact conveys a message or endorsement or disapproval"). Second, the government violates the Establishment Clause if it "applie[s] coercive pressure on an individual to support or participate in religion." *Elmbrook II,* 687 F.3d at 850; *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000); *Lee v. Weisman*, 505 U.S. 577 (1992). Though it is not clear whether or where this test belongs in the *Lemon* test, "it is evident that if the state 'coerce[s] anyone to support or participate in religion or its exercise,' an Establishment Clause violation has occurred." *Elmbrook II*, 687 F.3d at 850 (quoting *Lee*, 505 U.S. at 587) (alteration in original).

Here, the parties focus most heavily on the endorsement test, so the Court considers that test first. The Court then considers whether the show was religiously coercive, and whether it had a legitimate secular purpose.

### 1.      Endorsement

"[T]he prohibition against governmental endorsement of religion 'precludes government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred.'" *Allegheny*, 492 U.S. at 593 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 70 (1985) (O'Connor, J., concurring)) (alteration and emphasis omitted). The endorsement test "'asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" *Books II*, 401 F.3d at 867 (quoting *Freedom From Religion Found., Inc. v. City of Marshfield, Wisc.*, 203 F.3d 487, 493 (7th Cir. 2000)). In applying this test, courts "evaluate the effect of the challenged government action by 'assessing the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display amounts to an endorsement of religion.'" *Id.* (quoting

*Books I*, 235 F.3d at 304). More specifically, courts ask "whether an objective, reasonable observer, 'aware of the history and context of the community and forum in which the religious display appears,' would fairly understand the display to be a government endorsement of religion." *Id.* (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring)).

In addition, "the case law has evinced special concern with the receptivity of schoolchildren to endorsed religious messages," and has "long guarded against government conduct that has the effect of promoting religious teachings in school setting." *Elmbrook II*, 687 F.3d at 851. As the Seventh Circuit discussed in *Elmbrook II*, "[d]isplaying religious iconography and distributing religious literature in a classroom setting raises constitutional objections because the practice may do more than provide public school students with *knowledge* of Christian tenets, an obviously permissible aim of a broader curriculum." 687 F.3d at 851. "The concern is that religious displays in the classroom tend to promote religious beliefs, and students might feel pressure to adopt them." *Id.*

That does not mean, though, that any content or imagery that carries an inherently religious meaning must be purged from the school setting. *Stone v. Graham*, 449 U.S. 39, 42 (1980); *Sch. Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 225 (1963). Rather, context and circumstances remain key; as the Supreme Court noted in *Lynch*, to "[f]ocus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause." 465 U.S. at 680. Applying this fact-specific analysis, courts have held that school choirs can perform sacred music, *Bauchman ex rel. Bauchman v. W. High Sch.*, 132 F.3d 542, 554 (10th Cir. 1997) ("Any choral curriculum designed to expose students to the full array of vocal music culture . . . can be expected to reflect a significant number of religious

songs."); that Christmas carols can be sung at school assemblies, *Florey v. Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1315 (8th Cir. 1980); that students can reenact religious rituals as part of a secular curriculum, *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1380 n.6 (9th Cir. 1994); and even that students can present a living nativity scene as a part of a holiday program, *Doe v. Wilson Cty. Sch. Sys.*, 564 F. Supp. 2d 766, 800 (M.D. Tenn. 2008). None of those cases establishes bright-line rules, but each illustrates how in appropriate circumstances, religious content can permissibly intersect with a secular education. Conversely, the Court found on the preliminary injunction in this case that the living nativity scene the School proposed to present in 2015 was improper—not because living nativity scenes are categorically impermissible, but because the context and extent of that particular presentation would convey an endorsement of religion, which justified the injunction the Plaintiffs requested against performing a living nativity scene in that particular show.

Here, in arguing that the 2015 show endorsed religion, the Plaintiffs largely argue that the Court found that the proposed 2015 show endorsed religion, and that the only change to that version was replacing the student actors with mannequins. That is simply not true, though. Not only did the nativity scene in the actual 2015 show not include live actors, it was only on stage for under two minutes, while a single ensemble performed a single song.[8] Those changes fundamentally altered the nativity scene's role in the show as compared to previous versions. Prior shows emphasized the nativity and set it apart from any other aspect of the show in multiple respects: it was on stage for over twelve minutes while six different songs were

---

[8] The Plaintiffs fail to even acknowledge that fact in their briefing, instead repeatedly asserting that the only change was to replace students with mannequins in the nativity. Because the video conclusively refutes those assertions, they do not create genuine disputes of fact. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

performed by multiple ensembles representing a cross-section of the entire performing arts department. And even before the living nativity itself appeared on stage, student actors walked across stage in front of a backdrop, as if walking to Bethlehem, and a narrator told the story of Jesus' birth, making the nativity performance in effect the visual centerpiece of a twenty-minute portion of the show. By comparison, the rest of the show featured a series of independent performances of two to four minutes each, making the nativity by far the most prominent aspect of the show.

The portrayal of the nativity scene in the 2015 show was very different. As just noted, the nativity scene was on stage for less than two minutes. It did not span multiple performances, either, as it was only on stage while a choir sang a short version of O Holy Night,[9] and it was not on stage for the conclusion of the show. The scene was also less elaborate than in previous years. Previous shows included almost twenty student actors as part the living nativity scene. Mary and Joseph stood inside the stable behind a manger, with three students on each side dressed in white robes, depicting angels. Students dressed as the three wise men would then walk onto the stage and take their place in front of the nativity scene. In addition, multiple students were spread to the sides of the stage dressed as shepherds. The nativity scene that was actually presented in 2015, though, included only Mary, Joseph, and three wise men, each situated inside the stable set and depicted by mannequins instead of students.

When presented in that limited manner, the nativity scene did not stand out from any other portion of the show, during which almost every performance was accompanied by some

---

[9] A song that, while distinctly religious in nature, has been widely covered by popular musicians, including Nat King Cole, Bing Crosby, Liberace, Cher, Neil Diamond, Celine Dion, Mariah Carey, Destiny's Child, Christina Aguilera, Josh Groban, and Carrie Underwood. *See* http://www.allmusic.com/search/all/o%20holy%20night.

sort of visual complement in order to make the show visually as well as musically pleasing and engaging. For example, during a number of performances, images were projected onto the screens on each side of the stage. Many of the choir performances included dancing or choreography. Some of the performances by the string ensembles were accompanied by lighting shows. For one performance, the bands played a song called Secret Agent Santa, while actors on stage and in a recorded video projected over center stage showed Santa Claus apprehending present-thieves. In another, a percussion ensemble played a song called the 12 Drum Fills of Christmas, while the screen over center stage showed slides corresponding with the twelve days of Christmas as each day would have been mentioned in the song. The dance team also performed in multiple numbers, including one in which about twenty students dressed in costumes as wooden soldiers and other characters presented a choreographed routine while the bands played the Parade of the Wooden Soldiers. Other songs included decorations, costumes, props, and choreography, too.

Set against that context, nothing about the presentation of the nativity scene, which likewise provided the visual complement for a single song, drew additional emphasis to or suggested a preference for the nativity. To the contrary, it was presented on par with each of the other performances. Under those circumstances, even though the nativity scene is undoubtedly religious in nature, a reasonable observer would not perceive the show as expressing a preference for the nativity scene or endorsing its religious message. *Compare Books II*, 401 F.3d at 868 (holding that where the Ten Commandments were presented in a manner similar to the other, secular components of the display, the context did not suggest that they were included for their religious message), *with Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 773 (7th Cir. 2001) (finding that a monument of the Ten Commandments conveyed a message of endorsement

25

in part because it was "a display distinct both in its placement by other statues and monuments and in its content"); *see also Wilson Cty.*, 564 F. Supp. 2d at 799–801. Moreover, given the varied assortment of visuals throughout the show, the reasonable observer would not perceive an endorsement of Christianity over Chanukah or Kwanzaa simply because a Christmas song briefly included a stationary display on stage while the Chanukah and Kwanzaa songs featured images projected onto screens—neither stood out in the show as a whole.

The nativity scene also differed from previous years in that it did not portray a narrative of the story of Jesus' birth, thus further reducing its likelihood of conveying a religious message. In previous years, a narrator read passages from the Bible of the story of Jesus' birth during this portion of the show. As noted above, this segment also began with students walking across stage prior to the appearance of the nativity, as if walking to Bethlehem, after which the nativity scene appeared on stage, and the three wise men would then walk up to and take their place in front of the nativity, as if presenting their gifts to Jesus. The sequence of songs also roughly correlated with the nativity story, further reinforcing that narrative. As presented in that manner, the nativity was not just a pleasing aesthetic complement to the performance of Christmas songs, but conveyed a deeply religious message.

Those elements were each absent from the 2015 show, except that it included a similar sequence of songs. It would be asking far too much of the reasonable observer, though, to presume that they would perceive those songs (only some of which include words) as constituting a narrative of Jesus' birth. Rather, without those other cues, the observer would merely perceive them as a number of mostly-familiar songs that relate to Christmas, some of which include corresponding visuals. Thus, even though this portion of the show still includes

26

religious songs and some religious imagery, it does not embody nearly the same religious content.

In addition, the show's inclusion of Chanukah and Kwanzaa, and its spoken introductions of each of the holidays, further served to place those performances in a secular context.[10] After the intermission, the show resumed with a student reading the following introduction: "Welcome to the Spirit of the Season,[11] where we observe the many cultural celebrations during this holiday season." Then, along with each of the three holidays, the student read a brief introduction describing the holiday and its celebration. The Plaintiffs argue that the wording of the introductions expressed a preference for Christianity, but the Court disagrees. The introductions were each about the same length and included details about the background and celebration of the respective holidays, and adequately conveyed their educational messages.

Courts have found those sorts of explanations meaningful in deciding whether a display containing religious components sends a message of endorsement. For example, in *Books II*, the Seventh Circuit approved of a display containing the Ten Commandments in part because it contained a written explanation of the significance of each of the documents in the display. 401 F.3d at 868. Similarly, Justice O'Connor emphasized in *Allegheny* that a display containing a

---

[10] The Court found at the preliminary injunction stage that the inclusion of these holidays did not attenuate the message of endorsement, largely because the show still placed a disproportionate emphasis on the Christmas holiday, "and in particular the religious aspect of that holiday through the live depiction of the nativity scene." [DE 40 p. 18]. For the reasons just discussed, the show that the School actually presented did not place a similar emphasis on the religious aspect of the Christmas holiday through the nativity scene, thus negating that distinction. And as discussed below, the remaining distinction—more Christmas songs than Chanukah or Kwanzaa songs—is readily explained by secular factors when those songs are not used to amplify the religious message conveyed by other aspects of the show.

[11] The program listed each of the songs following the intermission under the heading "The Spirit of the Season." [DE 27-9].

Christmas tree and a menorah also included a sign stating that the city saluted liberty and freedom, so the display as a whole conveyed a message of pluralism and freedom of belief, not a message of endorsement of any of its religious components. 492 U.S. at 635 (O'Connor, J., concurring). Conversely, the Seventh Circuit in *O'Bannon* found that a display containing the Ten Commandments endorsed religion in part because it lacked "any marker explaining why these particular texts have been combined." 259 F.3d at 773. Here, the student-read introductions underscored that the performances during this portion of the show were meant to observe holidays celebrated by different cultures and religions, and thus conveyed a message of inclusion and education rather than endorsing the religious or cultural content of any of the performances. *See Books II*, 401 F.3d at 868 ("In a pluralistic society, reasonable people can usually tell the difference between preaching religion and teaching about the role of religion in our history.").

Granted, the show still included more Christmas songs than Chanukah[12] or Kwanzaa songs, perhaps emphasizing the Christmas holiday somewhat more than the other holidays. But the show also included many more secular songs, so the show as a whole did not present a disproportionate number of Christmas songs. In addition, the greater number of Christmas songs as compared to the other holidays would easily be perceived by a reasonable observer as reflecting the greater extent to which those songs have permeated into the secular culture. The hypothetical observer could likely hum along with any number of religious Christmas songs, like Angels We Have Heard on High; Hark, The Herald Angels Sing; or Joy to the World, while such an observer might be hard pressed to even recognize songs devoted to Chanukah or Kwanzaa.

---

[12] The Plaintiffs also argue that while the song Ani Ma'Amin represents the Jewish faith, it is not actually associated with Chanukah. Even assuming they are correct, though, no reasonable observer of the show would be aware of that distinction, so it is immaterial in this context.

That simply reflects the different extent to which those holidays have become a part of the secular culture, not an endorsement of one of the holidays over the others.[13]

Finally, a reasonable observer is also presumed to be aware of the history of an event. *McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005) ("[R]easonable observers have reasonable memories, and our precedents sensibly forbid an observer 'to turn a blind eye to the context in which [the] policy arose.'" (quoting *Santa Fe*, 530 U.S. at 315)); *Books II*, 401 F.3d at 867 (noting that the reasonable observer is "aware of the history and context of the community and forum in which the religious display appears"). The Plaintiffs argue that this factor cuts in their favor, as the observer would believe that the School made only superficial changes from the version at issue in the preliminary injunction, which the Court found was likely to violate the Establishment Clause. To begin with, the proper point of comparison would not be the version the School proposed to perform in 2015—given the injunction, the School never presented and no observer saw that version—but the version that had actually been presented in 2014 and in previous years. And the Court believes that an observer viewing the 2015 show would perceive substantial changes in comparison to those shows; changes that fundamentally altered the character of the show and the message it conveys. The overtly religious aspects of the previous shows were either omitted entirely (the Biblical

---

[13] *See Florey*, 619 F.2d at 1317 n.5 ("The singing of 'Christmas carols' appears to be a primary focal point of appellants' objections . . . . Today, carols are sung with regularity on public and commercial television and are played on public address systems in offices, manufacturing plants and retail stores in every city and village. . . . Many carols have a religious theme; some do not. As in the centuries gone by, some persons object to the singing of carols with a religious basis in any place but the church or home because they feel that to do so debases religion; others have the same objection but because they feel it enhances religion. We take no part in this argument, it being entirely clear to us that carols have achieved a cultural significance that justifies their being sung in the public schools of Sioux Falls, South Dakota, if done in accordance with the policy and rules adopted by that school district.").

narration) or altered and minimized (the nativity scene, which was on stage for only one song for under two minutes, was not composed of student performers, and was less elaborate than in previous years). The 2015 show also celebrated other religious and cultural holidays, with each introduced by a student (not a faculty member) reading a brief introduction of the holiday. The second act of the show also began with an explanation that it was observing the various cultural celebrations of the holiday season, which placed the performance of Christmas songs in a different light. In short, the Court believes that a reasonable observer would perceive the 2015 show as a genuine departure from the previous versions.

The same would be true even when comparing the actual 2015 show to the proposed show. Though the changes from that version were small in number, they were large in effect, and the presentation of the passive nativity scene for such a brief time was simply not comparable to the elaborate, live, extended nativity scene the School had proposed to present. If the reasonable observer was actually oriented to that proposed version of the show, they would understand that the School did not merely swap out students for mannequins, but also substantially changed the role the nativity scene played in the latter portion of the show. If anything, a reasonable observer would likely perceive the brief inclusion of a nativity scene as a nod to the show's tradition, not an effort to retain the religious message conveyed by prior shows. Thus, the history of the show would not cause the reasonable observer to believe that the show that was actually presented in 2015 endorsed religion, either.

At bottom, the endorsement test involves a holistic, qualitative assessment of the totality of the circumstances of a given display. Here, based on the circumstances and presentation of the show as a whole, and the way in which an objective, reasonable observer would likely perceive it, the Court finds that the Christmas Spectacular that was actually performed in 2015 did not

convey a message of endorsement of religion. Like the display containing the Ten Commandments in *Books II*, as to which the Seventh Circuit concluded that a reasonable observer would "think history, not religion," 401 F.3d at 869, the Court finds that a reasonable observer of the Christmas Spectacular would think music and performance, not religion. Accordingly, the show did not constitute an unlawful establishment of religion under the endorsement test.

    **2.**      **Coercion**

      Having found that the Christmas Spectacular did not convey a message of endorsement, the Court must also consider the Plaintiffs' argument that the Christmas Spectacular was unlawful because it was impermissibly coercive. In *Lee*, the Supreme Court stated that "the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a state religion or religious faith, or tends to do so.'" 505 U.S. at 587 (quoting *Lynch*, 465 U.S. at 678) (internal alteration omitted). Though the show here did not involve any exercise of religion, like prayer, the Seventh Circuit has held that this principle extends beyond the coercion of religious activity itself. *Elmbrook II*, 687 F.3d at 885. In *Elmbrook II*, the court explained that endorsement of religion and coercion of religion are "two sides of the same coin," as a government endorsement of religion will apply "'indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion.'" *Id.* (quoting *Wallace*, 472 U.S. at 60 n.51). Here, for the reasons just discussed, the Court does not find that the Christmas Spectacular as performed in 2015 endorsed religion, so the performers and audience members would not have been subjected to any indirect coercive pressure to conform to Christianity under that theory.

      The Seventh Circuit also held in *Elmbrook II* that coercion will be present "when the government directs students to attend a pervasively Christian, proselytizing environment." 687

F.3d at 855. There, the school held its graduation ceremony in a church that was full of religious imagery. The lobby of the church also had posters and banners directing religious messages to students; pamphlets that advertised the church's ministries for students and that called on the students "to live and love like Jesus"; and staff members ready to discuss the church's religious offerings. *Id.* at 852. The court described this environment as "obviously aimed at nurturing Christian beliefs and gaining new adherents among those who set foot inside the church." *Id.* at 853. The court found that this environment was coercive since it would "create subtle pressure" to conform to those beliefs, particularly if some attendees began partaking of the church's offerings, in which case the "law of imitation" would operate. *Id.* at 855.

Those same concerns are not present here. First, unlike the church in *Elmbrook*, there were no proselytizing materials that might have called students to partake in religious offerings or activities. And though the show included some religious songs and briefly displayed some religious imagery, it was not pervasively Christian. To the contrary, the show was pervasively secular, as the majority of the show was devoted to purely secular themes, and even the religious songs were mostly familiar songs that have become part of the secular culture. Further, because the manner in which the nativity scene was presented in this show did not convey a message of endorsement, the performers who were singing while the nativity scene was on stage would not have reasonably felt as if they were being coerced to celebrate a religious message through their performance.

Nor was there any opportunity for students or audience members to engage in any religious activity or observance such that the law of imitation would have exerted influence on other individuals. As for the audience members, their role was to passively observe the show while the nativity was on stage just the same as they passively observed the rest of the show.

32

Perhaps the presence of the nativity prompted some audience members to pray or meditate, but an audience member's internal, subjective response would not apply any coercive pressure to any other audience member.[14] The student performers likewise performed their respective parts the same with the nativity scene on stage as they would have without, and there was no opportunity for them to engage in any manifestation of religious observance. Again, perhaps some of the performers derived additional meaning from the presence of the nativity during their performance because of their own religious background, but those internal feelings would not have applied coercive force on their classmates. That distinguishes this case from *Elmbrook II*, 687 F.3d at 855, where the court was concerned that attendees would see other students taking pictures in front of the religious symbols or speaking with the church's staff members about its religious offerings, which could subtly influence them to do the same. Because those circumstances are not present here, the law of imitation would not have applied any coercive force on the performers or attendees. Therefore, the Court finds that the show did not violate the Establishment Clause under the coercion test.

### 3. Purpose

The Plaintiffs finally argue that the Christmas Spectacular was unlawful because its religious components lacked a legitimate secular purpose. "When the government acts with the ostensible and predominant purpose of advancing religion, it violates th[e] central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *McCreary*, 545 U.S. at 860. This prong of the *Lemon* test "asks whether the government's actual purpose is to endorse or disapprove of religion." *Books II*,

---

[14] The audience applauded when the nativity scene appeared on stage, but that reaction was not prompted in any way by the show itself (the choir began singing even before the applause concluded), and was quite clearly in response to the pending litigation, as the previous shows did not involve similar applause when the nativity appeared.

401 F.3d at 863. "[A] secular purpose need not be the exclusive one," though; "it is sufficient if the government has '*a* secular purpose.'" *Sherman*, 623 F.3d at 507 (quoting *Bridenbaugh v. O'Bannon*, 185 F.3d 796, 800 (7th Cir. 1999)) (internal alteration omitted). Courts also generally give deference to a government's stated purposes, but the stated secular purpose "has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864. Accordingly, courts evaluate a display's purpose in light of its particular presentation and circumstances, again through the eyes of an objective observer. *Id.* at 862.

Here, the School has articulated a number a secular purposes that guide the production and performance of the Christmas Spectacular. The show as a whole is intended to provide students with experience performing in front of live audiences. The School thus integrates as many aspects of the Performing Arts Department as possible into the show, including its bands, orchestras, choirs, and jazz bands, in addition to its dance teams, drama students, and stage technicians. The show is designed so as "to provide intense challenges to each performer through the planning and programming of this event." [DE 27 ¶ 8]. In addition, "[a]rtistic vision is a high priority in developing the program so that the students and audience can experience a holiday event that is aesthetically invigorating." [*Id.* ¶ 12]. In selecting the music to be performed, the directors strive to select "music that will challenge and educate the students in music performance and pedagogy. The music selections help students learn about holiday music through historical and cultural context. The performance of the music is also intended to provide an enjoyable auditory experience." [*Id.* ¶ 11; *see also* DE 33-2 p. 64]. Students are also encouraged to audition for special solos or small groups "to further enhance the educational challenge presented" by the program. [DE 27¶ 13]. Students also contribute to the visual aspects of the show, including by creating costumes, stage props and sets, and stage lighting, and

34

decorating the auditorium with garland, lights, and ornaments. Finally, as to the latter portion of the 2015 show in particular, the School sought to include historical and educational components reflecting the major December holidays.

The Court finds that the Christmas Spectacular that was performed, including its religious aspects, was fully consistent with those secular purposes. As to the nativity scene itself, it provided a visual complement to one of the musical performances, and thus served the goal of making the show both musically and visually pleasing and engaging. It also presumably involved a degree of stagecraft and lighting design, thus providing outlets for students in those areas, too. The manner in which the nativity scene was presented did not belie its secular purposes, either. As discussed above, the nativity was presented on par with each of the other performances during the show, which featured a wide array of visual displays, ranging from backdrops and stage decorations to acting, dancing, and choreography, to projections of videos and still images onto screens, all of which served to make the show "aesthetically invigorating."

As to the selection of music, all of the pieces, whether religious or secular, appeared to satisfy the goals of being challenging and educational, while also aesthetically pleasing and suited to be performed at a high level. And there is no outward indication that any of the religious songs were performed to promote their religious content instead of for those secular purposes. The number of Christmas songs performed was largely commensurate with the degree to which those songs are widely familiar and have become part of the secular culture. *See Florey*, 619 F.2d at 1317 n.5. The music director also explained that a reason why fewer Chanukah and Kwanzaa songs were included in the show was that there are comparatively fewer quality arrangements available at appropriate levels of difficulty for songs celebrating those holidays. That is a plausible and reasonable explanation, and the Plaintiffs do not suggest otherwise. In

addition, the performance of songs celebrating the holidays of Chanukah, Kwanzaa, and Christmas, along with the spoken introductions for each of the holidays, served to expose the performers and audience to and educate them about those holidays.[15]

Nor does the show's history undermine these secular purposes. To the contrary, as discussed above, a reasonable observer would perceive substantial changes to the 2015 show that fundamentally changed the message it conveyed. Since the show that was actually presented was plainly consistent with the School's secular purposes, the distinct shows that were presented in the past would not change that fact. Moreover, despite the religious content of the previous shows, that history does not necessarily reflect the absence of a secular purpose. The School modeled the show after the Radio City Christmas Spectacular, which the marching band attended while on a trip to New York City. Emulating such a successful and longstanding theatrical production is a reasonable way to increase interest in the show, for both the performers and audience members, and to ensure that the show was presenting an "invigorating" and high-quality performance. [DE 27 ¶ 12 (noting that "[a]rtistic vision is a high priority in developing the program so that the students and audience can experience a holiday event that is aesthetically invigorating")]. That doing so also meant incorporating religious content does not mean that the

---

[15] The Plaintiffs argue that the Chanukah and Kwanzaa songs could not have served those purposes, as they did not include lyrics in English. Music is not only culturally or educationally significant when it contains words the listener will understand, though; music is significant in its own right, and these songs served to expose the performers and audience to the music of those traditions. Moreover, the Plaintiffs' argument that Ani Ma'Amin only represents Judaism in general, not Chanukah in particular, and their criticisms about the depth of the music director's knowledge of Chanukah and Kwanzaa, fail to show that these secular purposes are actually shams. *See Books II*, 401 F.3d at 866 ("The purpose prong of the *Lemon* test does not require us to evaluate the quality or sufficiency of the historical analysis embodied in the County's display."); *see also McCreary*, 545 U.S. at 872 (criticizing the content of a display where, unlike here, the content wholly failed to bear out the stated purpose and also artificially inflated the role of religion).

show lacked a secular purpose (nor does it mean that the show would pass muster under the other Establishment Clause tests, either).

Therefore, the Court finds that the Christmas Spectacular that was actually presented in 2015 had secular purposes, and thus satisfied *Lemon's* purpose prong, too. Accordingly, having found that the Christmas Spectacular satisfied each of the Establishment Clause tests at issue, the Court concludes that the show did not violate the Establishment Clause.

## IV. CONCLUSION

The Court takes both parties' motions for summary judgment under advisement as to the 2014 and proposed-2015 shows. The School's supplemental brief as to mootness is due by October 5, 2016, with any response from the Plaintiffs due by October 26, 2016. The Plaintiffs' supplemental brief as to the appropriate remedy, if any, for those shows is due by October 5, 2016, with any response from the School due by October 26, 2016. Finally, the Court grants the School's motion for summary judgment as to the 2015 show, finding that it did not violate the Establishment Clause. The Court denies the Plaintiffs' motion for summary judgment to the same extent.

SO ORDERED.

ENTERED:  September 14, 2016


_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

AO 450 (Rev. 01/09)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Northern District of Indiana

FREEDOM FROM RELIGION
FOUNDATION; JOHN DOE;
JACK DOE; JOHN ROE; and
JOHN NOE,
Plaintiffs

v.                    **Civil Action No. 3:15-CV-463  JD**

CONCORD COMMUNITY
SCHOOLS,
Defendant

### JUDGMENT IN A CIVIL ACTION

The court has ordered that (*check one*):

___  the plaintiff _____
recover from the defendant _____ the amount of _____
_____ dollars $_____, which includes prejudgment interest at the rate of _____% plus post-
judgment interest at the rate of _____ % along with costs.

____   the plaintiff recover nothing, the action is dismissed on the merits, and the defendant _____
recover costs from the plaintiff _____.

  _X__  Other:   _Judgment is entered in favor of Defendant Concord Community Schools and against
Plaintiffs Freedom From Religion Foundation, John Doe, Jack Doe, John Roe and John Noe in that Defendant
did not violate the Establishment Clause as to the 2015 show. Judgment entered in favor of Plaintiffs Freedom
From Religion Foundation, John Doe, Jack Doe, John Roe and John Noe and against Defendant Concord
Community Schools in that Defendant violated the Establishment Clause as to the 2014 and proposed 2015
shows. Nominal damages are AWARDED in the amounts of Seven Dollars ($7.00) to Plaintiff Jack Doe; One
Dollar ($1.00) to Plaintiff John Doe; One Dollar ($1.00) to Plaintiff John Roe; and One Dollar ($1.00) to
Plaintiff Freedom From Religion Foundation._

This action was (*check one*):

___ tried to a jury with Judge _____ presiding, and the jury has rendered
a verdict.

___ tried by Judge _____ without a jury and the above decision was
reached.

 _X_  decided  by Judge _____Jon E. DeGuilio_____ on Motions _____for Summary Judgment._____

DATE:_____March 7, 2017_____          ROBERT N. TRGOVICH, CLERK OF COURT

                                            By_____s/C. Reed_____
                                                 *Signature of Clerk or Deputy Clerk*